## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DAVID PETERSEN, WAYNE LITCHFIELD, CHRISTY OGRODOSKI, LINDA JOHNSON, and WILLIAM COHEN, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**CHASE CARD FUNDING, LLC, CHASE ISSUANCE TRUST, and WILMINGTON TRUST COMPANY, as Trustee of Chase Issuance Trust,**<br><br>**Defendants.** | **JURY TRIAL DEMANDED**<br><br>Case No. |

## CLASS ACTION COMPLAINT

1.    Plaintiffs David Petersen, Wayne Litchfield, Christy Ogrodoski, Linda Johnson, and William Cohen (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this consumer class action against Defendants Chase Card Funding, LLC and Chase Issuance Trust, (together, "Defendants") to obtain statutory damages, compensatory damages, punitive damages, restitution, and declaratory and/or injunctive relief for Plaintiffs and the Class defined herein.  Defendant Wilmington Trust Company ("Wilmington Trust") is named solely in its capacity as trustee for Chase Issuance Trust.

2.    Defendants charge, collect, and receive usurious rates of interest from New York consumers, including Plaintiffs, in excess of New York's usury cap.  In so doing, Defendants have violated New York General Obligations Law § 5-501 and New York Banking Law § 14-a and also have been unjustly enriched as a result of their unlawful conduct.

1

3.     Plaintiffs assert the following allegations upon information and belief, except as to their own respective actions, the investigation of their counsel, and the facts that are a matter of public record.

## INTRODUCTION

4.     New York has forbidden the practice of usury for over 200 years.

5.     Since at least 1787, New York has prohibited lenders from charging excessive interest to debtors.[1]   This ancient and bedrock principle remains a part of New York consumer financial law.

6.     At all times relevant to this Complaint, New York has forbidden the collection of interest above 16% per annum.  N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a.  Persons and corporations are forbidden from "directly or indirectly, charg[ing], tak[ing] or receiv[ing]" interest above the usury limit.  Interest includes not just items labeled as "interest," but also certain fees.  *See* 3 N.Y.C.R.R. § 4.2(b).

7.     The State of New York has such a strong interest in protecting consumers from unreasonable interest charges that receiving interest at some levels is a felony.  New York Penal Law § 190.40 states that a "person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

8.     Here, Defendants receive principal and interest payments from Plaintiffs and Class members (as defined below) that are made pursuant to credit card loans.  Defendants have charged,

---

[1] *See* L 1787, Ch. 13 (barring taking of interest above 7%).

taken, and received interest from Plaintiffs and Class members at rates in excess of 16%, in violation of New York's longstanding civil usury limit.

9.      This class action suit seeks monetary damages, restitution, and injunctive relief to restore wrongfully obtained usurious interest payments and to prevent Defendants from charging, collecting, or receiving usurious interest in the future.

## PARTIES

10.      Plaintiff David Petersen is a consumer and a citizen of the State of New York, residing in Brooklyn, New York.

11.      Mr. Petersen is a debtor on two unsecured credit card loans.  One credit card loan is branded as the "Chase Sapphire" card ("Petersen Sapphire Loan"), and another is branded as the "Chase Slate" card ("Petersen Slate Loan").  .

12.      Mr. Petersen is currently carrying a balance on the Petersen Sapphire Loan on which he pays an interest rate of at least 18.24%.

13.      Mr. Petersen is currently carrying a balance on the Petersen Slate Loan on which he pays an interest rate of at least 17.24%.

14.      Mr. Petersen sends payments on these loans to an entity described as "Chase Card Services."

15.      Mr. Petersen believes that he opened both the Petersen Sapphire Loan and the Petersen Slate Loan over ten years ago.

16.      On information and belief, Mr. Petersen's payments with respect to the Petersen Sapphire Loan and the Petersen Slate Loan are owed to, and are paid to, Defendant Chase Card Funding, LLC and/or Defendant Chase Issuance Trust.

17.      Plaintiff Wayne Litchfield is a consumer and a citizen of the State of New York, residing in Medina, New York.

3

18.     Mr. Litchfield is a debtor on an unsecured credit card loan. His credit card loan is branded as the "Chase Freedom" card ("Litchfield Freedom Loan").

19.     Mr. Litchfield currently carries a balance on the Litchfield Freedom Loan on which he pays an interest rate of at least 17.24%.

20.     Mr. Litchfield sends payments on the Litchfield Freedom Loan to an entity described as "Chase Card Services."

21.     Mr. Litchfield believes he opened the Litchfield Freedom Loan approximately eight years ago.

22.     On information and belief, Mr. Litchfield's payments with respect to the Litchfield Freedom Loan are owed to, and are paid to, Defendant Chase Card Funding, LLC and/or Defendant Chase Issuance Trust.

23.     Plaintiff Christy Ogrodoski is a consumer and a citizen of the State of New York, residing in Auburn, New York.

24.     Ms. Ogrodoski is a debtor on two unsecured credit card loans branded as "Chase Freedom" ("Ogrodoski Freedom Loan"), and Chase Slate ("Ogrodoski Slate Loan") loans.

25.     Ms. Ogrodoski is currently carrying a balance on the Ogrodoski Freedom Loan on which she pays an interest rate of at least 25.24%.

26.     Ms. Ogrodoski is currently carrying a balance on the Ogrodoski Slate Loan on which she pays an interest rate of at least 27.24%.

27.     Ms. Ogrodoski sends payments on these loans to an entity described as "Chase Card Services."

28.     Ms. Ogrodoski believes she opened both the Ogrodoski Freedom Loan and the Ogrodoski Slate Loan in or around 2016.

29.     On information and belief, Ms. Ogrodoski's payments with respect to the Ogrodoski Freedom Loan and the Ogrodoski Slate Loan are owed to, and are paid to, Defendant Chase Card Funding, LLC and/or Defendant Chase Issuance Trust.

30.     Plaintiff Linda Johnson is a consumer and a citizen of the state of New York, residing in Albany, New York.

31.     Ms. Johnson is a debtor on an unsecured credit card loan.  Her credit card loan is branded as the "Chase Freedom" card ("Johnson Freedom Loan").

32.     Ms. Johnson is currently carrying a balance on the Johnson Freedom Loan on which she pays an interest rate of at least 21.49%.

33.     Ms. Johnson sends payments on this loan to an entity described as "Chase Card Services."

34.     Ms. Johnson believes she opened the Johnson Freedom Loan more than 10 years ago.

35.     On information and belief, Ms. Johnson's payments with respect to the Johnson Freedom Loan are owed to, and are paid to, Defendant Chase Card Funding, LLC and/or Defendant Chase Issuance Trust.

36.     Plaintiff William Cohen is a consumer and a citizen of the State of New York, residing in Brooklyn, New York.

37.     Mr. Cohen is a debtor on an unsecured credit card loan.  His credit card loan is branded as the "Chase Freedom" card ("Cohen Freedom Loan").

38.     Mr. Cohen is currently carrying a balance on his Cohen Freedom Loan on which he pays an interest rate of at least 25.24%.

39.     Mr. Cohen sends payments on this loan to an entity described as "Chase Card Services."

40.     On information and belief, Mr. Cohen's payments with respect to the Cohen Freedom Loan are owed to, and are paid to, Defendant Chase Card Funding, LLC and/or Defendant Chase Issuance Trust.

41.     Defendant Chase Card Funding, LLC is a Delaware Limited Liability Company.

42.     Defendant Chase Issuance Trust is a Delaware Statutory Trust, of which Defendant Wilmington Trust Company is the Owner Trustee and Defendant Chase Card Funding LLC is the beneficiary.[2]

43.     Neither Defendant Chase Issuance Trust nor Defendant Chase Card Funding LLC is a bank.

## JURISDICTION AND VENUE

44.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and more than two-thirds of the proposed Class reside in states other than the states in which Defendants are citizens.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Declaratory relief is available under 28 U.S.C. §§ 2201 and 2202.

45.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because Plaintiff Litchfield resides in this District and suffered injury as a result of Defendants' acts in this District; many of the acts and transactions giving rise to this action occurred in this District;

---

[2] See Fourth Amended and Restated Trust Agreement, January 20, 2016, *available at* https://www.jpmorgan.com/pdfdoc/jpmc/ir/Program_Document_24.pdf
 (Last visited: May 30, 2019).

Defendants do substantial business throughout this District, Defendants have intentionally availed themselves of the laws and markets of this District; and Defendants are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

46.     Defendants have violated New York law by charging, taking and receiving payments from Plaintiffs and other New York consumers at interest rates exceeding the state usury limit.

47.     Defendants acquire the usurious interest payments from Plaintiffs and the Class through a series of purchases involving a shell company as part of a process known as credit card securitization.

### *Credit Card Securitization Generally*

48.     Credit card securitization transactions begin with a financial institution (the securitization "sponsor") assembling a pool of receivables on credit card loans that it made or acquired.  The sponsor then sells the receivables as part of a multi-step transaction that ultimately results in the sponsor exchanging the receivables for cash.

49.     Specifically, the sponsor first selects receivables arising from specific accounts and sells the entire balance of these receivables, as well as the right to purchase future receivables generated by those accounts to a wholly-owned, special-purpose subsidiary of the sponsor (the "depositor"), that has no other assets or liabilities.  This first sale is made to isolate the receivables from the sponsor's assets and liabilities, making them "bankruptcy remote," in the sense that they cannot be clawed back into the sponsor's bankruptcy or FDIC receivership estate.  Absent bankruptcy remoteness, investors in the securitization could not invest based solely on the quality of the receivables and the risks specific to them.  Instead, they would be exposed to the overall risks of the sponsor firm.

7

50.     Second, the depositor sells these receivables (and the right to purchase future receivables) to a passive single-purpose entity ("SPE"), usually a trust.  The SPE must be a stand-alone, legally-independent entity and *cannot be a subsidiary of the sponsor*, in order to ensure that it could not be consolidated in bankruptcy or FDIC receivership with the sponsor.  The legal separation of the SPE from the sponsor and depositor is critical to ensure that investors in the securitization are able to invest solely in the quality of the receivables and the risks specific to them, rather than the overall risks of the sponsor and depositor.

51.     To raise the funds to pay the depositor for the initial receivables, the SPE issues certificated securities (essentially bonds) to the depositor.  The depositor sells them to investors through underwriting affiliates.  Because these securities issued by the SPE are collateralized by the receivables (assets) owned by the SPE, they are called "asset-backed securities" or "ABS." The depositor then uses the funds from the SPE's sale of ABS to investors in order to pay the sponsor for the initial receivables.[3]

52.     The securitization transaction includes not just the sale of outstanding receivables on the designated credit card accounts, but also the right to purchase any new receivables generated by the designated accounts. As cardholders' subsequent purchase activities generate more receivables on the account, the new receivables are purchased (ultimately) by the SPE from the sponsor through the depositor. The SPE uses the principal payments collected from cardholders on the initial receivables to acquire the new receivables from the sponsor. The interest payments and fees collected from the cardholders are used to pay the SPE's operating expenses and the interest payments due on the ABS.

---

[3] Alternatively, the depositor may transfer the ABS to the sponsor, which will then sell them into the market through an underwriting affiliate or directly.  Either way, the ultimate effect is the same:  the sponsor has transformed a pool of credit card receivables into cash.

53.     The SPE is designed to be a passive entity in order to enable ABS investors to invest solely in the risks of the receivables, not the general operating risks of a firm.  The credit card receivables the SPE owns must be managed, however, as it is necessary for cardholders to be sent billing statements and for payments to be collected from them. Therefore, the SPE contracts with a servicing agent (the "servicer") to collect the payments from the cardholders on behalf of the SPE for the benefit of the ABS holders. The servicer is often the issuer or an affiliate thereof, but need not be. Because the SPE owns the receivables, collections of the receivables from cardholders by the servicer are not made for the benefit of the financial institution that issued the credit cards in the first instance even if the servicer is the issuer.

54.     The securitization transaction effectively separates the beneficial ownership of the receivables from the legal title to the receivables and from the management of the receivables:  the SPE holds the legal title to the receivables;[4] the passive ABS investors (holders of the ABS) are the beneficial owners of the receivables; and the servicer manages the receivables as the agent of the SPE.

### Defendants' Credit Card Securitization Process

55.     Defendants Chase Issuance Trust and Chase Card Funding LLC are engaged in collecting, taking and receiving payments from Plaintiffs and Class members for debts incurred through credit card loans originated by non-parties affiliated with J.P. Morgan Chase & Co.

56.     The diagram below, from a May 4, 2018 prospectus for notes issued by Defendant Chase Issuance Trust, outlines the way credit card loan payments are obtained by Defendants. As shown in the diagram, non-party Chase Bank USA, N.A. ("Chase USA") is the sponsor; Defendant

---

[4] If the SPE is a common law trust, then the trustee holds legal title.

Chase Funding is the depositor; and Defendant Chase Issuance Trust is the SPE that issues the

ABS.[5]



---

[5] Prospectus available at https://www.jpmorgan.com/pdfdoc/jpmc/ir/chait_2018-
A1_prospectus.pdf (last visited: May 30, 2019).  In or about May 2019, Chase Bank USA, N.A.
merged with JP Morgan Chase Bank, N.A.

57.     The securitization process begins with consumers opening credit card loan accounts.  In the case of accounts securitized by Defendants, most accounts are originated and marketed by affiliates or agents of non-party J.P. Morgan Chase & Co.

58.     After Plaintiffs and Class members open credit card accounts, certain accounts are designated by non-party Chase USA for securitization.

59.     Defendant Chase Card Funding LLC is solely a shell company that has no employees and engages in no activity other than the purchase and re-sale of debts.  Its only function is to purchase receivables from non-party Chase USA, and, in turn, sell those receivables to Defendant Chase Issuance Trust.  For purposes of these transactions, the term "receivables" refers to all payments owed by credit card debtors such as Plaintiffs, including principal and interest payments, and payments for all fees, including late fees, over limit fees, and annual fees.

60.     According to Defendants, the purchase of these receivables is a true and complete sale of the loan payments.  As stated in a contract that governs Defendant Chase Card Funding's role in the securitization, the Receivables Purchase Agreement, Defendant Chase Card Funding acquired "all right, title and interest in, to and under [the credit card receivables]."[6]  Receivables Purchase Agreement at Sections 2.01(b)(ii), 2.02 (a).

61.     As part of this true and complete sale, non-party Chase USA and Defendant Chase Card Funding further agreed that the loan payments "shall be deemed to no longer be the property, assets or rights of Chase USA."   Receivables Purchase Agreement at Section 2.01(e).

62.     Under the terms of the Receivables Purchase Agreement, Defendant Chase Card Funding is legally bound to purchase and receive the consumers' payment obligations on the

---

[6] January 20, 2016 Receivables Purchase Agreement ("Receivables Purchase Agreement") available at https://www.jpmorgan.com/pdfdoc/jpmc/ir/Program_Document_25.pdf (last visited: May 30, 2019).

designated accounts, even if the debt or fee payment obligation has not yet been incurred. Receivables are sold the same day they are created.  *See* Receivables Purchase Agreement at Section 2.01(c).

63.     According to another contract governing the sale of the receivables from Defendant Chase Card Funding to Defendant Chase Issuance Trust, following Defendant Chase Card Funding's purchase of all right, title and interest in the receivables from non-party Chase USA, Defendant Chase Card Funding "sell[s], transfer[s], assign[s], set[s] over and otherwise convey[s] to [Defendant Chase Issuance] Trust… all right, title and interest in, to and under" the loan receivables.[7] *See* Transfer and Servicing Agreement at Section 2.01(b).

64.     By the terms of its Trust Agreement, Defendant Chase Issuance Trust is a "single purpose entity"—a corporate entity created solely to purchase receivables from Defendant Chase Card Funding LLC and to issue notes against the payments from Class members and other debtors. Trust Agreement at Section 2.03.

65.     As part of the securitization contract, Defendants agreed "that any property, assets or rights purported to be transferred, in whole or in part" by the Transfer and Servicing Agreement "shall be deemed no longer to be the property, assets or rights" of Defendant Chase Card Funding, but will become the property of Defendant Chase Issuance Trust. *See* Transfer and Servicing Agreement at Section 2.01(e).

66.     To be particularly explicit, Defendants further stated in the Transfer and Servicing Agreement that the transfer of credit card receivables "constitute[s] a sale, and not a secured borrowing for accounting purposes."  *Id*. at 2.01(f)

---

[7] Fourth Amended and Restated Transfer and Servicing Agreement ("Transfer and Servicing Agreement") available at https://www.jpmorgan.com/pdfdoc/jpmc/ir/Program_Document_20.pdf (last visited: May 30, 2019).

67.     Because Defendants purchase of the debt payment obligations are true sales of all "right title and interest" in the receivables, in the event that the originating entity, in this case non-party Chase USA, were placed in FDIC receivership, the payment obligations would not be property of the receivership estate.

68.     Having purchased the receivables on Plaintiffs' and Class members' loans, Defendant Chase Issuance Trust sells securities to investors backed by these payment obligations as ABS.[8]  The proceeds of these ABS sales pay for Defendant Chase Issuance Trust's purchase of receivables from Defendant Chase Card Funding.

69.     Defendant Chase Issuance Trust bears all the credit risk on the receivables it has purchased and is responsible for their collection. Because the Trust is a single-purpose entity with no employees, and the credit card receivables it owns must be managed (*e.g.*, billing statements sent out to cardholders and payments collected from them), the Trust contracts with a servicer to collect the payments from the cardholders on behalf of the Trust for the benefit of the ABS holders.

70.     Defendant Chase Issuance Trust pays the servicer a fee to collect on the payment obligations owned by the Trust.  As part of this fee, all expenses related to servicing the receivables are reimbursed to the servicer and borne by the Trust.  *See* Transfer and Servicing Agreement at Section 4.02.

71.     Under the Receivables Purchase Agreement, non-party Chase USA granted Defendant Chase Card Funding LLC "a license to use the name 'Chase Bank USA, National Association' and all related identifying trade or service marks, signs, symbols, logos designs … and other intangibles in connection with the servicing of the Receivables." *See* Receivables Purchase Agreement at Section 3.04.

---

[8] The sale is done indirectly and the mechanics of the sale are not material to this complaint.

72.     Because Defendants utilize the name, logos, and other indicia of Chase Bank USA in billing and collections, the true owner of an account holder's receivables is concealed from the public, including Plaintiffs and the Class.

### *Securitization of Plaintiffs' Debt Payments*

73.     The list of specific accounts whose receivables have been sold is held by Defendants in secret and is ascertainable only from Defendants' nonpublic records.   Public information demonstrates, however, that accounts whose payment obligations have been purchased by Defendants include those of Class members paying interest at rates that exceed New York's usury limit.

74.     According to a February 2019 prospectus for ABS from Defendant Chase Issuance Trust, the following are attributes of receivables for loans owned by Defendant Chase Issuance Trust: [9]

- 8.9% of the accounts in the securitization pool were from borrowers with a New York billing address;

- the average age of the accounts was approximately 206 months;

- 42.3% of the accounts had a balance between $0.01 and $5,000; and

- 7.9% of the accounts had a balance between $5,000.01 and $10,000.

75.     According to the Static Pool Data the Chase Issuance Trust reported pursuant to federal securities laws, the Chase Issuance Trust had in 2018 a yield from finance charges, fees, and interchange of between 17.18% and 20.49%.[10] This entire range is above the 16% maximum permitted by New York law.

---

[9] Prospectus *available at* https://www.sec.gov/Archives/edgar/data/1174821/000119312519034136/d658524d424h.htm. (Last visited: May 30, 2019).
[10] https://www.jpmorgan.com/pdfdoc/jpmc/abs_static/chait_Q418.pdf.  (Last visited: May 30, 2019).

76.     Each of Plaintiff Petersen's, Plaintiff Litchfield's, Plaintiff Ogrodoski's, Plaintiff Johnson's, and Plaintiff Cohen's loans are consistent with these characteristics and are, upon information and belief, among the loans whose payments have been purchased by Defendant Chase Card Funding and Defendant Chase Issuance Trust.

77.     Through this securitization scheme, Defendants have engaged in a standard practice and policy of charging, collecting, receiving, and attempting to collect interest from Plaintiffs and Class members in excess of the permissible interest rate in New York.

<em><strong>Madden</strong> and the <strong>Attempted "Madden Fix"</strong></em>

78.     In 2015, the Second Circuit considered a usury case brought by a cardholder against a debt collector that had acquired the cardholder's defaulted credit card loan. *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).  The plaintiff in *Madden*, a New York resident, alleged that the defendants violated the New York usury statute by charging and attempting to collect interest at a rate higher than that permitted by New York law.  The defendant debt collector argued that the National Bank Act ("NBA") preempted the claim alleging violation of the New York state usury rate because the debt collector purchased the plaintiff's credit card loan from a national bank that was entitled to charge an interest rate allowed by the laws of the state, territory, or district where the bank is located.[11]  *See Madden*, 786 F.3d at 250 (quoting 12 U.S.C. § 85).

79.     The Second Circuit rejected the defendant's argument in *Madden* and held that entities other than national banks are only entitled to NBA-preemption under the limited circumstance where application of state law to the underlying action would significantly interfere with a national bank's ability to exercise its powers under the NBA. Specifically, the Second

---

[11] More specifically, the defendants argued that "as assignees of a national bank, they too are allowed under the [National Bank Act] to charge interest at the rate permitted by the state where the assignor national bank is located—here, Delaware." *Id.* at 250.

Circuit noted that "state usury laws would not prevent consumer debt sales by national banks to third parties. Although it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states (i.e., those with firm usury limits, like New York), such an effect would not 'significantly interfere' with the exercise of a national bank power." *Id.* at 251. The Supreme Court denied *certiorari*.

80.     The Second Circuit's decision in *Madden* thus made clear that non-banks cannot charge usurious interest rates merely because they purchased or were assigned loans by national banks.

81.     Following the *Madden* decision, the banking industry was indisputably on notice that national banks could not sell or assign their ability to charge otherwise usurious interest rates to non-national bank third parties.

82.     In fact, the industry conceded this fact when urging the Supreme Court to grant *certiorari*. The Structured Finance Industry Group, an entity that lobbies on behalf of entities engaged in securitization, admitted in its *amicus* brief in favor of *certiorari* that *Madden* held that the National Bank Act does not "preempt the application of state usury law to sales of bank loans to non-banks[.]" Brief of the Structured Finance Industry Group, Inc., et al. as Amici Curiae in Support of Petitioners, *Midland Funding, LLC v. Madden*, No. 15-610 (December 10, 2015) at 3.

83.     Industry *amici* urged that *Madden* be overturned, explicitly because "firms have removed loans made to borrowers in the Second Circuit from asset-backed securitizations due to usury concerns." Brief of the Clearing House Association, LLC, et al. as Amici Curiae Supporting Petitioners, *Midland Funding, LLC v. Madden*, No. 15-610 (December 10, 2015) at 23. Notwithstanding this industry understanding of the law, non-banks, including Defendants here, still collect and receive interest from New York consumers in violation of New York's usury limit.

84.    Indeed, although neither Defendant Chase Issuance Trust nor Defendant Chase Funding LLC is a bank, they continued to purchase usurious credit card receivables from a national bank well after the *Madden* decision.

85.    Rather than bring securitization practices into compliance with the clear statement of law, the lending industry chose to lobby Congress unsuccessfully to change the law.

86.    The lending industry reported spending millions of dollars collectively on lobbying activity in 2017 and 2018, with specific references to two congressional bills informally known as "*Madden* Fix" legislation. Ultimately, neither the Financial CHOICE Act of 2017 (H.R. 10), nor the Protecting Consumers Access to Credit Act of 2017 (H.R. 3299, S. 1642) became law.

87.    Despite failing to change the law, Defendants have still not changed their unlawful and usurious practices.[12]

## CLASS ACTION ALLEGATIONS

88.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following individuals:

> All individuals residing in New York that have paid interest to Defendants directly or indirectly pursuant to a credit card loan at a rate above 16% at any time since June 6, 2013 (the "Class").

---

[12] A February 2019 article by analysts with Standard & Poors / S&P Global that discussed the *Madden* decision and Colorado's efforts to enforce its usury laws against non-bank entities observed that some recent securitization transactions "excluded those loans made to Colorado residents above the state's usury limits … or with collateral pools that excluded all loans made to Colorado residents."  *See* Chouhan *et al*., *Marketplace Lending and the True Lender Conundrum*, *available at* https://www.capitaliq.com/CIQDotNet/CreditResearch/RenderArticle.aspx?articleId=2171229& SctArtId=467289&from=CM&nsl_code=LIME&sourceObjectId=10887397&sourceRevId=1&f ee_ind=N&exp_date=20290222-18:32:49 (last visited: May 30, 2019).  The clear implication is that lenders can readily exclude loans that violate state usury rates from their securitization pools if they choose to do so.

89.     Excluded from the Class are borrowers other than individuals, including but not limited to corporations, LLCs, non-profits and other organizations, and borrowers with credit card loan balances that exceed $250,000.00 or with credit card accounts that have been deemed to be in default.  Also excluded from the Class are Defendants, their subsidiaries, affiliates, officers, directors, legal representatives, and employees; all persons who make a timely election to be excluded from the Class; governmental entities; and any judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based on information learned through discovery.

90.     Class certification is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

91.     <u>Numerosity—Fed. R. Civ. P. 23(a)(1)</u>. The Class is comprised of thousands of individuals who are or were New York credit card account holders, the joinder of which in one action would be impracticable.  The exact number or identification of the Class members is presently unknown.  The identity of the Class members is ascertainable and can be determined based on Defendants' records, records of originator entities, or similar entities and/or public records.

92.     <u>Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>.  The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

(a)     Whether the Class members were charged interest at rates above 16%;

(b)     Whether Defendants received the Class members payments, directly or indirectly;

18

(c)     Whether, as a result of Defendants' conduct, Plaintiffs and the Class have suffered injury and, if so, the appropriate relief; and

(d)     Whether Plaintiffs and the Class are entitled to damages and/or punitive damages or other relief.

93.     Typicality—Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of those of the Class in that Plaintiffs, like all Class members, incurred debt and paid interest at rates above the applicable New York statutory limit. Plaintiffs have suffered damages in the form of additional interest costs, and such damages are consistent with those suffered by Class members.

94.     Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1).     Plaintiffs are adequate representatives of the Class because they fit within the definition of the Class and their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs are represented by experienced Class Counsel.  Class Counsel have litigated numerous class actions, including many class actions involving the financial services industry, and Plaintiffs' counsel intends to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and Class Counsel will fairly and adequately protect the interests of all of the Class members.

95.     Superiority—Fed. R. Civ. P. 23(b)(3).  A class action is the best available method for the efficient adjudication of this litigation, because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiffs and the Class have suffered irreparable harm as a result of Defendants' conduct.  Because of the size of the individual Class members' claims, no Class member could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful and unfair conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law.  Further, individual litigation

has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

96.     Plaintiffs and the Class do not anticipate any difficulty in the management of this litigation.

## FIRST CAUSE OF ACTION
### New York General Obligations Law § 5-501
### (on Behalf of Plaintiffs and the Class)

97.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and succeeding paragraphs of this Complaint as if fully set forth herein.

98.     Defendants have violated and continue to violate N.Y. Gen. Obl. Law §5-501 and N.Y. Bank. Law §14-a by charging, taking, and receiving interest from Plaintiffs and the Class at a rate in excess of the 16% usury limit.

99.     Pursuant to N.Y. Gen. Obl. Law §§5-511 and 5-513, Plaintiffs and the Class are entitled to a declaration that Defendants cannot collect or receive interest at rates above the legal limit, and are entitled to disgorgement of all sums paid in excess of the usury limit.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### (on Behalf of Plaintiffs and the Class)

100.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and succeeding paragraphs of this Complaint as if fully set forth herein.

101.    As a result of Defendants' unlawful actions described above, Defendants have been and continue to be unjustly enriched at the expense of Plaintiffs and the Class as a result of their payment of excessive and improper interest rates.

102.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiffs and the Class.

103.    Defendants should be required to disgorge the monies they have unjustly obtained to the detriment of Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request judgment against Defendants granting the following relief:

a.    An order certifying this case as a class action and appointing Plaintiffs' counsel to represent the Class and Plaintiffs as representatives of the Class;

b.    All recoverable compensatory and other damages sustained by Plaintiffs and the Class;

c.    Actual, treble, punitive, and/or statutory damages for injuries suffered by Plaintiffs and the Class in the maximum amount permitted by applicable law;

d.    An order requiring Defendants to immediately cease their wrongful conduct as set forth above;

e.    Payment of reasonable attorneys' fees and costs as may be allowable under applicable law;

f.    Payment of pre-judgment and post-judgment interest, as applicable; and

g.    All such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:  June 6, 2019                              Respectfully submitted,

Charles J. LaDuca (NY Bar No. 397927)
C. William Frick
Daniel Cohen
Christian Hudson
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW
Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Fax: (202) 789-1813
Email: charlesl@cuneolaw.com
Email: bill@cuneolaw.com
Email: christian@cuneolaw.com

Shanon J. Carson
Glen L. Abramson
Patrick F. Madden
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604
Email: scarson@bm.net
Email: gabramson@bm.net
Email: pmadden@bm.net

*Attorneys for Plaintiffs*