**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

DAVID PETERSEN, WAYNE
LITCHFIELD, CHRISTY OGRODOSKI,
LINDA JOHNSON, and WILLIAM
COHEN, individually and on behalf of all
others similarly situated,

        Plaintiffs,

     v.

CHASE CARD FUNDING, LLC, CHASE
ISSUANCE TRUST, and WILMINGTON
TRUST COMPANY, as Trustee of Chase
Issuance Trust,

        Defendants.

Case No. 19 Civ. 00741 (LJV)

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS BY DEFENDANTS CHASE CARD FUNDING LLC,**
**CHASE ISSUANCE TRUST, AND WILMINGTON TRUST COMPANY**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................................1

BACKGROUND .......................................................................................................................2

      A.    Statutory Background ...........................................................................2

      B.    *Madden* ....................................................................................................4

      C.    Securitization .........................................................................................6

      D.    This Lawsuit...........................................................................................8

STANDARD OF REVIEW .......................................................................................................8

ARGUMENT .............................................................................................................................9

I.     Petersen's New York Claims Are Preempted By The National Bank Act ........................9

      A.    The NBA Preempts The Application Of New York Usury Law To Interest
Charged By JPMCB, A National Bank..................................................9

      B.    *Madden* Does Not Support Petersen's Claims.....................................12

      C.    Courts Have Repeatedly Rejected Attacks On Securitizations Like
Petersen's ...........................................................................................15

      D.    The Application Of New York Law Here Also Is Preempted Because It
Would Significantly Interfere With JPMCB's Federally Authorized Power
To Deal In Loans (Here, Through Securitization Of The Loans'
Receivables) .......................................................................................17

II.    Even If New York Usury Law Applied—And It Does Not—Petersen's Claims
Fail ..................................................................................................................................19

III.   Petersen's Usury Claim Is Partially Time Barred And His Unjust Enrichment
Claim Should Be Dismissed ...........................................................................................21

CONCLUSION........................................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................8

*American Express Bank FSB v. Najieb*,
  4 N.Y.S.3d 6 (N.Y. App. Div. 2015) ......................................................................16

*Baptista v. JPMorgan Chase Bank, N.A.*,
  640 F.3d 1194 (11th Cir. 2011) ..............................................................................11

*Barnett Bank of Marion County, N.A. v. Nelson*,
  517 U.S. 25 (1996)...............................................................................................3, 18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................8

*Beneficial National Bank v. Anderson*,
  539 U.S. 1 (2003)...................................................................................2, 3, 10, 11

*Clougher v. Home Depot U.S.A., Inc.*,
  696 F. Supp. 2d 285 (E.D.N.Y. 2010) ....................................................................23

*Corsello v. Verizon New York, Inc.*,
  967 N.E.2d 1177 (N.Y. 2012)..................................................................................22

*Cram v. Hendricks*,
  7 Wend. 569 (N.Y. Sup. Ct. 1831)...........................................................................20

*Dae Hyuk Kwon v. Santander Consumer USA*,
  742 F. App'x 537 (2d Cir. 2018) .............................................................................21

*Davidson v. Capital One Bank (USA), N.A.*,
  44 F. Supp. 3d 1230 (N.D. Ga. 2014), *aff'd*, 797 F.3d 1309 (11th Cir. 2015) ......16

*Davis v. Elmira Savings Bank*,
  161 U.S. 275 (1896)...................................................................................................2

*Dorros v. JP Morgan Chase Bank, N.A.*,
  2011 WL 13217681 (C.D. Cal. July 22, 2011).......................................................12

*Drake v. Laboratory Corp. of American Holdings*,
  458 F.3d 48 (2d Cir. 2006)........................................................................................8

*European American Bank v. Cain,*
   436 N.Y.S.2d 318 (2d Dep't 1981)....................................................................23

*Faber v. Metropolitan Life Insurance Co.,*
   648 F.3d 98 (2d Cir. 2011)........................................................................8, 9

*Farmers' & Mechanics' National Bank v. Dearing,*
   91 U.S. 29 (1875).......................................................................................2

*Gaither v. Farmers & Mechanics Bank of Georgetown,*
   26 U.S. 37 (1828)......................................................................................20

*Green Bus Lines, Inc. v. General Motors Corp.,*
   565 N.Y.S.2d 124 (2d Dep't 1991)...............................................................23

*Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.,*
   761 F.3d 1027 (9th Cir. 2014) ....................................................................12

*Im v. Bayview Loan Servicing LLC,*
   2018 WL 840088 (S.D.N.Y. Feb. 12, 2018)................................................7, 9

*In re Donnay,*
   184 B.R. 767 (Bankr. D. Minn. 1995) .........................................................20

*In re Rent-Rite Superkegs West, Ltd.,*
   2019 WL 2179688 (Bankr. D. Colo. May 20, 2019)..........................................20

*Kaneff v. Delaware Title Loans, Inc.,*
   587 F.3d 616 (3d Cir. 2009)........................................................................11

*Kapernekas v. Brandhorst,*
   638 F. Supp. 2d 426 (S.D.N.Y. 2009)...........................................................23

*Krispin v. May Department Stores Co.,*
   218 F.3d 919 (8th Cir. 2000) .............................................................2, 5, 13, 15

*Leder v. American Traffic Solutions, Inc.,*
   81 F. Supp. 3d 211 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir. 2015).........................22

*Madden v. Midland Funding, LLC,*
   786 F.3d 246 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016) ................................. *passim*

*Malmsteen v. Berdon, LLP,*
   477 F. Supp. 2d 655 (S.D.N.Y. 2007).............................................................23

*Marquette National Bank of Minneapolis v. First of Omaha Service Corp.,*
   439 U.S. 299 (1978)....................................................................................3

*Munn v. Commission Co.*,
    15 Johns. 44 (N.Y. Sup. Ct. 1818) ..........................................................................21

*Nichols v. Fearson*,
    32 U.S. 103 (1833) ..........................................................................................20

*Pacific Capital Bank, N.A. v. Connecticut*,
    542 F.3d 341 (2d Cir. 2008)...........................................................................3, 11

*Phipps v. FDIC*,
    417 F.3d 1006 (8th Cir. 2005) ......................................................................5, 13

*Rebeil Consulting Corp. v. Levine*,
    617 N.Y.S.2d 830 (2d Dep't 1994).............................................................21, 22

*Rice v. Mather*,
    3 Wend. 62 (N.Y. Sup. Ct. 1829).......................................................................20

*S & R Development Estates, LLC v. Town of Greenburgh*,
    336 F. Supp. 3d 300 (S.D.N.Y. 2018)................................................................24

*Salter v. Havivi*,
    215 N.Y.S.2d 913 (N.Y. Sup. Ct. 1961) ............................................................20

*Scott v. Bank of America*,
    580 F. App'x 56 (3d Cir. 2014) ......................................................................6, 15

*Sepehry-Fard v. Department Stores National Bank*,
    2013 WL 6574774 (N.D. Cal. Dec. 13, 2013), *aff'd in part*, 670 F. App'x 573
    (9th Cir. 2016)....................................................................................................16

*Shak v. JPMorgan Chase & Co.*,
    156 F. Supp. 3d 462 (S.D.N.Y. 2016).................................................................22

*Silva v. Smucker Natural Foods, Inc.*,
    2015 WL 5360022 (E.D.N.Y. Sept. 14, 2015) ..............................................22, 23

*Slinin v. Shnaider*,
    2017 WL 464426 (S.D.N.Y. Feb. 2, 2017)..........................................................22

*Smiley v. Citibank (South Dakota), N.A.*,
    517 U.S. 735 (1996)........................................................................................3, 11

*State v. Bankers Finance Corp.*,
    26 A.2d 220 (Del. Ct. Gen. Sess. 1942)..............................................................20

*Sullivan v. American Airlines, Inc.*,
    424 F.3d 267 (2d Cir. 2005).................................................................................3

*Utts v. Bristol-Myers Squibb Co.*,
   251 F. Supp. 3d 644 (S.D.N.Y. 2017)...........................................................................8

*Wachovia Bank, N.A. v. Burke*,
   414 F.3d 305 (2d Cir. 2005)....................................................................................2

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015)..............................................................6, 7, 19

*Willard v. Bank of America*,
   204 F. Supp. 3d 829 (E.D. Pa. 2016) .....................................................................16, 17

**Docketed Cases**

*Midland Funding, LLC v. Madden*, No. 15-610 (U.S.) ......................................................21

**Statutes, Rules & Regulations**

12 C.F.R.
   § 7.4008..................................................................................................4, 17, 19

12 U.S.C.
   § 24(Seventh) ...........................................................................................3, 17
   § 25.................................................................................................3, 17, 19
   § 85.......................................................................................................3, 10

Del. Code Ann. Title 5, § 943 ..............................................................................11

N.Y. C.P.L.R. § 215(6) .......................................................................................21

**Other Authorities**

CHAIT A(2018-1) Prospectus (May 4, 2018),
   https://www.jpmorgan.com/pdfdoc/jpmc/ir/chait_2018-A1_prospectus.pdf ....................7, 10

FDIC, Credit Card Securitization Manual, *Introduction* (2007),
   https://www.fdic.gov/regulations/examinations/credit_card_securitization/index.html ...............................................................................................18

Fourth Amended and Restated Transfer and Servicing Agreement (Jan. 20, 2016),
   https://www.sec.gov/Archives/edgar/data/1174821/000119312516434830/d102477dex45.htm ...............................................................................7, 14

Office of the Comptroller of the Currency, *Preemption Determination and Order*,
    68 Fed. Reg. 46,264-02 (2003) ............................................................................................19

Receivables Purchase Agreement (Jan. 20, 2016),
    https://www.sec.gov/Archives/edgar/data/1174821/000119312516434830/d10
    2477dex44.htm ...................................................................................................................7, 14

SEC Form 8-K (May 20, 2019),
    https://www.sec.gov/Archives/edgar/data/869090/000119312519151611/d649
    976d8k.htm .........................................................................................................................6

## INTRODUCTION

The National Bank Act (NBA) completely preempts the application of state usury law to national banks.  In *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016), the Second Circuit held that this ordinarily applicable preemption rule did not apply where the national bank that originated a credit-card account sold the account to a non-bank third-party debt buyer.  In those narrow circumstances—where the national bank was not the entity that charged the interest that the plaintiff challenged, and where the bank had no continuing interest in the account—the Second Circuit held that the NBA did not preempt the application of state usury law.

This case seeks to radically expand *Madden*.  JPMorgan Chase Bank, N.A. (JPMCB), a national bank, owns David Petersen's credit-card account and continues to charge the interest assessed on it.  Through a practice common in the credit-card industry, JPMCB securitized the receivables—*i.e.*, the right to receive Petersen's payments (principal, interest, and fees)—by transferring the right to receive those receivables (and nothing else) to a trust, which in turn sold securities to investors.  Seeking to bring his claims within the scope of *Madden*, Petersen equates JPMCB's securitization of his receivables with the outright sale of his credit-card account.  Courts have consistently and repeatedly rejected that equation, however, and it avails Petersen nothing here.

Indeed, far from supporting Petersen, *Madden* itself shows why the Complaint should be dismissed.  *Madden* explained that ordinary NBA preemption principles prohibit the application of New York usury law where a national bank has an interest in a credit-card account, as is true when the national bank is the entity that charges the interest to which a plaintiff objects.  Here, as the Complaint makes clear, JPMCB continues to own Petersen's account and is the entity that charges the interest he says exceeds the New York statutory cap.  The NBA preempts the

1

application of New York usury law to restrict that national bank power to set interest rates, so Petersen's usury claims fail.  That the account receivables were securitized is immaterial. *Madden* carved out an exception to ordinary preemption principles because the national bank there sold the credit-card account itself, retaining no ongoing interest in the account, and the non-bank defendants in that case charged the interest to which Madden objected.  In marking out that exception, the court distinguished cases like *Krispin v. May Department Stores Co.*, 218 F.3d 919 (8th Cir. 2000), where preemption applied because the bank sold its receivables only, while retaining an interest in the accounts—the very practice Petersen challenges here.

Petersen's claims are thus on the wrong side of the *Madden* line.  Because the securitization of credit-card receivables involves only the transfer of the right to income associated with the account, and preserves the issuing national bank's ownership of the account, including retention of the right to set and charge interest, preemption applies and Petersen's New York usury claims must be dismissed.

## BACKGROUND

### A.    Statutory Background

The National Bank Act (NBA) provides for a system of national banks to serve as "instrumentalities of the federal government," *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896), "designed to be used to aid the government in the administration of an important branch of the public service," *Farmers' & Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 33 (1875). The Act contemplates that nationally chartered banks will operate nationwide, and accordingly it shields national banks from "'possible unfriendly State legislation.'"  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10 (2003).  Indeed, whereas the law ordinarily presumes that Congress does not intend to preempt state law, that "presumption … disappears" with respect to "[r]egulation of federally chartered banks."  *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314

2

(2d Cir. 2005); *see Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996) ("In defining the pre-emptive scope of statutes and regulations granting a power to national banks, [the Supreme Court's] cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted.").

To carry out Congress's purposes, the NBA vests in nationally chartered banks enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24(Seventh).  Primary among the enumerated powers is the power to set interest rates.  The rates that national banks may charge on loans they originate are "governed by federal law."  *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 308 (1978); *see* 12 U.S.C. § 85; *id.* § 25b(f).  A national bank is entitled to "export" interest rates permitted by one state when dealing with customers from other states, even when those rates are higher than the laws of the customers' states would permit.  *See, e.g.*, *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 737 (1996); *Marquette Nat'l Bank*, 439 U.S. at 314-15.

The "impairment" of state usury laws by the exportation of interest rates "has always been implicit in the structure of the National Bank Act."  *Marquette Nat'l Bank*, 439 U.S. at 318.  The NBA thus "provide[s] the exclusive cause of action" for usury claims against national banks, *Beneficial Nat'l Bank*, 539 U.S. at 11, and "completely preempt[s] analogous state-law usury claims," *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 275 (2d Cir. 2005).  For this reason, there is "no such thing as a state-law claim of usury against a national bank."  *Beneficial Nat'l Bank*, 539 U.S. at 11; *see also Pac. Capital Bank, N.A. v. Conn.*, 542 F.3d 341, 352 (2d Cir. 2008) ("[A] state in which a national bank makes a loan may not permissibly require the bank to charge an interest rate lower than that allowed by its home state.").

Consistent with Section 85 of the NBA, regulations promulgated by the Office of the

Comptroller of the Currency (OCC)—the primary federal regulator for national banks—provide that a "national bank may make, sell, … or otherwise deal in loans" not secured by real estate, "subject to such terms … prescribed by … Federal law."  12 C.F.R. § 7.4008(a).  The regulations specifically provide that a national bank is entitled to make such loans "without regard to state law limitations concerning … [r]ates of interest."  *Id.* § 7.4008(d).

### B.     *Madden*

Petersen seeks to do precisely what the OCC regulations prohibit—enforce state-law limitations (namely, New York limitations) concerning the rates of interest that JPMCB charges on its credit-card loans.  Petersen's case seeks to accomplish this by expressly advocating for expansion of the Second Circuit's 2015 decision in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016).  That decision accordingly merits discussion.

Madden opened a credit-card account with Bank of America, N.A. (BoA), a national bank, and her account was later consolidated into a portfolio held by FIA Card Services, N.A., also a national bank.  *See* 786 F.3d at 247-48.  After Madden defaulted on her account, FIA sold her debt to Midland Funding, LLC (Midland), which is not a national bank.  FIA did so by selling and assigning Madden's account itself.  *Id.* at 248-49.  Thus, "[u]pon Midland Funding's acquisition of Madden's debt, neither FIA nor BoA possessed any further interest in the account."  *Id.* at 248.  Importantly, Madden's complaint concerned the interest that Midland—not FIA or BoA—"charged after her account was sold by FIA."  *Id.* at 253.  Specifically, Midland sought to charge Madden a rate of 27% per year, which would have exceeded the statutory usury cap under New York law, where Madden lived.  *Id.* at 248, 250.

Madden sued Midland for the interest it charged her, alleging violations of New York civil and criminal usury law, as well as New York's general consumer protection statute (N.Y.

Gen. Bus. Law § 349) and the federal Fair Debt Collection Practices Act (FDCPA). The district court ruled that Midland, because it was FIA's assignee, was entitled to the same exemption from state usury laws as was FIA, the national bank assignor. To reach that conclusion, the court relied on decisions such as *Krispin v. May Department Stores Co.*, 218 F.3d 919 (8th Cir. 2000), which held that NBA preemption precluded state-law usury claims against non-national bank entities.

      The Second Circuit reversed. The court recognized the preemption principles discussed above—*i.e.*, that Section 85 permits a national bank to charge interest at the rate permitted by its home state, and that Section 86 provides the exclusive cause of action for usury claims against national banks. The Second Circuit found those principles inapplicable, however, in the circumstances of the case, where Midland, a non-national-bank entity that had taken over complete control of Madden's account, itself charged the interest at issue. 786 F.3d at 250-53. On those facts, the court reasoned, there was no reason why "applying state usury laws to the third-party debt buyer[] would significantly interfere with either [BoA's or FIA's] ability to exercise its powers under the NBA." *Id.* at 251. The Second Circuit distinguished the district court's principal authorities, *Krispin* and *Phipps v. FDIC*, 417 F.3d 1006 (8th Cir. 2005). The court explained that, contrary to the circumstances of BoA and FIA—in which they possessed no "further interest in the account" after the sale to Madden—the national banks in *Krispin* and *Phipps* either retained an ongoing ownership interest in the account (by virtue of having sold only the receivables) or charged the interest rate being challenged, thereby justifying preemption under the NBA. *See* 786 F.3d at 252 ("Unlike *Krispin*, neither BoA nor FIA has retained an interest in Madden's account[.]"); *id.* at 253 ("*Phipps* is distinguishable" because "the national bank was the entity that charged the interest to which the plaintiffs objected").

5

C.     Securitization

JPMCB—which Petersen did not name as a defendant in the Complaint—is the national bank that owns Petersen's credit-card account and with which Petersen has his contractual credit-card relationship. *See* Compl. ¶¶ 48, 56, Dkt. No. 1 (alleging that national bank "originator" of loans "made" the loans in the first instance).[1]  JPMCB sets his interest, sends him his monthly account statements, and bills him for any outstanding loan principal and interest.

Petersen's Complaint focuses on JPMCB's securitization of credit-card account receivables. Compl. ¶¶ 56-72. Securitization is "typical" among credit-card issuers; it "provides steady liquidity for card issuers" and "transfer[s] most downside credit risk on the card[.]" *Scott v. Bank of Am.*, 580 F. App'x 56, 56 (3d Cir. 2014). Through securitization, the card issuer pools the receivables associated with credit-card accounts—which include the principal, interest payments, and fees—and places them into a trust, which then issues securities to investors. By doing so, the issuer receives a steady stream of money to lend, and the risk that the collections on the receivables are lower than expected is borne by the numerous investors in the trust instead of the bank. Importantly, "[c]redit card securitization involves the securitization solely of the receivables, not of the accounts themselves." *Id*. at 57. "The courts that have considered the effect of securitizing credit card receivables are all in agreement that it does not divest the issuer of its ownership interest in the credit card accounts." *Id*.

Here, as the Complaint alleges, JPMCB sells credit-card receivables to Chase Card

---

[1]     Chase Bank USA, N.A., a national bank, originated Petersen's credit-card account and, until May 18, 2019, owned the account. On that date, Chase Bank USA, N.A. merged into JPMCB, also a national bank. Compl. ¶ 56 n.5. As part of that merger, JPMCB assumed Chase Bank USA, N.A.'s obligations with respect to the Trust, *see* SEC Form 8-K, a fact of which the Court may take notice, *see Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

Funding LLC pursuant to a Receivables Purchase Agreement (RPA).  Compl. ¶¶ 59-60.  As the title of the agreement underscores, JPMCB sells card receivables only, not the accounts themselves.  The agreement provides that JPMCB continues to be the owner and servicer of the credit-card accounts (*see* RPA § 1.01 (Definitions)); that the bank sells "certain *Receivables* existing or arising in designated revolving credit card accounts of [JPMCB]" (*id.* at Whereas Clauses (emphasis added)); and that the bank retains the right to "change the terms and provisions of the applicable Credit Card Agreements or the applicable Credit Card Guidelines in any respect (including the reduction of the required minimum monthly payment, the calculation of the amount, or the timing, of charge-offs and the Periodic Finance Charges and other fees to be assessed thereon)" (*id.* § 2.08(e)).

Chase Card Funding LLC sells the receivables it purchases from JPMCB to the Chase Issuance Trust pursuant to a Transfer and Servicing Agreement (TSA), which likewise identifies JPMCB as the credit-card account owner and servicer.  Compl. ¶¶ 59, 63; TSA § 1.01 (Definitions).[2]  Investors then buy securities issued by the Trust and backed by such receivables.  Compl. ¶¶ 68, 69.  The Trust prospectus explains that the Trust's assets include "[r]eceivables originated in [credit-card accounts] owned by [JPMCB]."  CHAIT A(2018-1) Prospectus at viii.[3]

The result of this arrangement is that JPMCB, a national bank, continues to own the credit-card accounts while the associated receivables are owned by the Trust, which is not a national bank.  Compl. ¶ 43.

---

[2]     The Court may consider these agreements on a motion to dismiss because they are relied on by and referenced in the Complaint, *see Im v. Bayview Loan Servicing LLC*, 2018 WL 840088, at *2 (S.D.N.Y. Feb. 12, 2018), and accessible on official government websites, *see Wells Fargo Bank*, 127 F. Supp. 3d at 166.  *See* RPA (Jan. 20, 2016); TSA (Jan. 20, 2016).

[3]     The CHAIT A(2018-1) Prospectus dated May 4, 2018 is incorporated by reference in the Complaint, Compl. ¶ 56 n.5.  *See Im*, 2018 WL 840088, at *2.

7

### D.      This Lawsuit

Petersen, a New York resident, has two JPMCB credit cards, with current interest rates of 17.24% and 18.24%, respectively—both of which are provided for in his card agreement. Compl. ¶¶ 12, 13.[4]  The receivables associated with one of these accounts are currently held in the Trust.  Petersen contends that, pursuant to *Madden*, the defendants must comply with New York usury laws and cannot lawfully receive interest on his credit-card loans in excess of New York's usury cap of 16%.  He brings claims under New York General Obligations Law (GOL) § 5-501 and for unjust enrichment, *id.* ¶¶ 97-103, seeks to represent a class of New York residents who have paid the defendants interest on credit-card loans in excess of 16%, *id.* ¶ 88, and requests damages and injunctive relief, *id.* (Prayer for Relief).

### STANDARD OF REVIEW

"It is well-established that preemption may be analyzed and decided at the motion to dismiss stage.  After all, a 'determination regarding preemption is a conclusion of law.'"  *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 672 (S.D.N.Y. 2017) (quoting *Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 56 (2d Cir. 2006)).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro.*

---

[4]      The Complaint was originally brought by five plaintiffs, including Petersen.  After the defendants informed opposing counsel that the receivables for the other four plaintiffs' credit-card accounts were not securitized in the Trust at any point during the putative class period, counsel voluntarily moved to dismiss the four other plaintiffs, and the Court granted that motion. Dkt. Nos. 19 & 20.

*Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  However, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions."  *Id.*  "When considering a motion to dismiss under Rule 12(b)(6), a court may 'look[] only to the complaint; documents that are attached as exhibits to, incorporated by reference, or integral to the complaint; and matters of which judicial notice may be taken.'"  *Im v. Bayview Loan Servicing LLC*, 2018 WL 840088, at *2 (S.D.N.Y. Feb. 12, 2018).

## ARGUMENT

**I.      Petersen's New York Claims Are Preempted By The National Bank Act**

The National Bank Act preempts the application of state usury law to national banks. *Madden* carved out a narrow exception to that rule, applicable only in circumstances where the national bank surrenders all interest in a loan and the third-party purchaser itself charges the allegedly usurious interest rate.  *Madden* confirmed the narrowness of that rule by contrasting the facts of that case with settled precedent holding that where a national bank retains an interest in the loan or charges the allegedly usurious interest itself, the ordinary preemption rule applies. Petersen seeks to expand *Madden* beyond its clearly delineated boundaries by applying New York usury law to his loan—which is owned by a national bank that sets and charges the account's interest rate and collects the associated finance charges.  There is good reason not to expand *Madden* beyond its already limited reach, but the Court need not even entertain that submission:  The defendants clearly prevail under *Madden*.

### A.      The NBA Preempts The Application Of New York Usury Law To Interest Charged By JPMCB, A National Bank

Though Petersen artfully pleads around JPMCB, a national bank, by naming three non-national bank entities as the defendants here, his Complaint asserts a New York-law challenge to interest charged to him by JPMCB—and only JPMCB.  His New York usury claims thus fall

squarely within the NBA's complete preemption of state-law usury claims.

Section 85 of the NBA "expressly permits national banks to 'charge on any loan …

interest at the rate allowed by the laws of the State, Territory, or District where the bank is

located,'" *Madden*, 786 F.3d at 250 (quoting 12 U.S.C. § 85), such that "there is 'no such thing

as a state-law claim of usury against a national bank,'" *id.* (quoting *Beneficial Nat'l Bank*, 539

U.S. at 11).  In view of that settled law, the Second Circuit in *Madden* recognized that FIA, a

national bank incorporated in Delaware, was permitted under the NBA to charge interest rates

allowable under Delaware law.  *See id.* (FIA's collection at Delaware's interest rates "in New

York does not violate the NBA and is not subject to New York's stricter usury laws, which the

NBA preempts").

Here, the only entity charging anything to Petersen is JPMCB, a national bank.  JPMCB

owns and services Petersen's account; each month, he makes a payment on his credit-card

accounts to JPMCB.[5]  JPMCB sets his interest rates, has the exclusive prerogative to change

those interest rates, and collects the amounts due on the account:  As the documents incorporated

into the Complaint make clear, JPMCB's duties with respect to Petersen's account "include

billing, collecting and investigating payment delinquencies on accounts, maintaining records for

each cardholder account and other managerial and custodial functions."  CHAIT A(2018-1)

Prospectus at 63; *see also id.* at 46 (JPMCB reserves the right to, among other things,

"increase[e] or decreas[e] periodic interest charges").[6]  Thus, any grievance Petersen has

---

[5]      The Complaint alleges that Petersen sends his payments to Chase Card Services.  Compl.
¶ 14.  Chase Card Services is not a legal entity; it is the name given to the part of the national
bank's credit-card business that handles billing for credit-card customers.

[6]      The Complaint includes conclusory allegations that the defendants "charge[d],
collect[ed], and receive[d]" payments from Petersen.  Compl. ¶ 2; *see also id.* ¶¶ 8, 46.  But
those allegations merely parrot the words of the New York usury statute; they do not include any
facts showing that any of the defendants actually charges Petersen anything.  The documents

regarding his interest rate is with JPMCB.  The fact that JPMCB later passes the receivables on to another entity is completely irrelevant.

Petersen's New York usury and unjust-enrichment claims against Chase Card Funding LLC, Chase Issuance Trust, and Wilmington Trust Company, all challenge the interest that JPMCB charged (and continues to charge) on his credit-card account.  Under Section 85, however, JPMCB may charge interest according to Delaware law, irrespective of what the usury law of Petersen's home state, New York, allows.  *See Pac. Capital Bank*, 542 F.3d at 352 ("[A] state in which a national bank makes a loan may not permissibly require the bank to charge an interest rate lower than that allowed by its home state.").  And under Delaware law, JPMCB may charge the interest prescribed in a written agreement, and may export that rate to New York.  *See* Del. Code Ann. tit. 5, § 943; *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 622 (3d Cir. 2009).  This is all a matter of federal law, and federal law completely preempts any state-law usury claim—such a claim simply does not exist.  *See Madden*, 786 F.3d at 250 ("there is 'no such thing as a state-law claim of usury against a national bank'" (quoting *Beneficial Nat'l Bank*, 539 U.S. at 11)).

Because only JPMCB charges the interest challenged here, not the defendants, Petersen's Complaint under New York law is a direct challenge to JPMCB's federally authorized banking power and is preempted.[7]

---

incorporated into the Complaint prove that is exclusively the role of JPMCB, and Petersen cannot allege, consistent with Rule 11, to the contrary.

[7]     This reasoning forecloses Petersen's unjust-enrichment claim just as it forecloses his statutory usury claim.  As the Supreme Court and others have consistently held, where an unjust-enrichment or other state-law claim "relies on identical facts as" a state statutory usury claim, "it too is preempted."  *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 (11th Cir. 2011); *see also Smiley*, 517 U.S. at 738 n.1 (holding that the NBA provision providing for exportation of interest rates encompasses credit-card late-payment fees in a case where the petitioner's complaint included state common-law claims, including for unjust enrichment);

### B.    *Madden* Does Not Support Petersen's Claims

Petersen explicitly models his Complaint on *Madden*, and contends that the Second Circuit's decision changes the preemption analysis in this case because JPMCB securitized the receivables on his account.  That is wrong.

*Madden* turned on two critical factual premises:  First, that the national bank had sold and completely assigned Madden's credit-card account to a non-national bank entity, and so had no further interest in the account.  *See Madden*, 786 F.3d at 248 ("Upon Midland Funding's acquisition of Madden's debt, neither FIA nor BoA possessed any further interest in the account.").  And, second, that the interest Madden challenged was being charged by Midland itself, after it acquired the loan from FIA.  *See id.* ("Midland Credit sent Madden a letter seeking to collect payment on her debt and stating that an interest rate of 27% per year applied," and "had charged a usurious rate of interest in violation of New York law").

In those circumstances—where the national bank had completely severed its relationship with the plaintiff, having sold and assigned the account itself (and not simply the receivables) to Midland, and Midland itself charged the usurious interest—the Second Circuit held that there was no reason why the NBA would preclude application of state law to the debt buyer.  *See* 786 F.3d at 251 ("No other mechanism appears on these facts by which applying state usury laws to the third-party debt buyers would significantly interfere with either national bank's ability to exercise its powers under the NBA.").

---

*Hawaii ex rel. Louie v. HSBC Bank Nev., N.A.*, 761 F.3d 1027, 1036 (9th Cir. 2014) (explaining that courts "must decide whether the complaints challenged the 'rate of interest' that the card providers charged, regardless of the state law monikers affixed to the … claims"); *Dorros v. JP Morgan Chase Bank, N.A.*, 2011 WL 13217681, at *8 (C.D. Cal. July 22, 2011) ("The NBA preempts various state law claims pertaining to usury (including challenges to 'excessive' fees), such as breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, negligent misrepresentation, and violation of the California UCL.").

In reaching that conclusion, the Second Circuit specifically distinguished circumstances in which a national bank retains an interest in its account, including by selling only the receivables, or the national bank charges the challenged interest itself.  *See* 786 F.3d at 252-53 (discussing *Krispin* and *Phipps*).  In *Krispin*, a department store (which was not a national bank) issued credit cards, assigned and transferred those accounts to a national bank, and then purchased the bank's receivables and played a role in account collections.  *See id.* at 252.  The Eighth Circuit held that the NBA preempted the plaintiffs' state-law claims against the department store because the "store's purchase of the bank's receivables does not diminish the fact that it is [] the bank, and not the store, that issues credit, processes and services customer accounts, and sets such terms as interest and late fees"—in other words, "the real party in interest [was] the bank." *Id.* (quoting *Krispin*, 218 F.3d at 924).  The point of *Krispin*, the Second Circuit explained, is that, "notwithstanding the bank's sale of its receivables to [the department store], it retained substantial interests in the credit card accounts so that application of state law to those accounts would have conflicted with the bank's powers authorized by the NBA."  *Id.* at 252 n.2.

The *Madden* court likewise distinguished *Phipps*, in which a national bank charged a fee (which the court concluded should be treated as interest) in connection with originating a mortgage, and the bank paid that fee to a non-bank third party.  *See* 786 F.3d at 253.  What mattered for the preemption analysis, the Second Circuit concluded, was that "the national bank was the entity that charged the interest to which the plaintiffs objected."  *Id.*; *see id.* ("Here, on the other hand, Madden objects only to the interest charged after her account was sold by FIA to the defendants.").

This case is like *Krispin* and *Phipps*, and not at all like *Madden*.  Here, as in *Krispin*, all

13

JPMCB has done is sell the receivables associated with Petersen's account. *E.g.*, Compl. ¶¶ 55-

72. According to the Second Circuit, it was enough in *Krispin* that the national bank "retained

substantial interests in the credit card accounts." *Madden*, 786 F.3d at 252 n.2. JPMCB retains

more than just an interest in Petersen's account; JPMCB retains the account itself. The

documents incorporated into the Complaint underscore the point. The Receivables Purchase

Agreement (RPA) conveys precisely what JPMCB was selling (credit-card receivables) and what

it was not selling (credit-card accounts). The RPA expressly provides that JPMCB continues to

be the credit-card "account owner," RPA § 1.01 (Definitions); and that it continues to have

authority to "change the terms and provisions of the applicable Credit Card Agreements or the

applicable Credit Card Guidelines in any respect (including the reduction of the required

minimum monthly payment, the calculation of the amount, or the timing, of charge-offs and the

Periodic Finance Charges and other fees to be assessed thereon)," *id.* § 2.08(e). The TSA

likewise identifies JPMCB as the credit-card account owner. TSA § 1.01 (Definitions). And

here, as in *Phipps*, JPMCB assesses and charges the interest to which Petersen objects.

As the Second Circuit recognized in *Madden*, these features—a retained interest in the

credit-card account and the ability to set and collect interest—are what matter for purposes of

Section 85. Petersen entered into a written cardmember agreement with JPMCB, which remains

in force. The bank accordingly has enforceable obligations to Petersen—for example, the

obligation to charge no more interest than permitted by the agreement. And Petersen has

enforceable obligations to the bank—for example, paying JPMCB the rate of interest charged in

accordance with the terms of the agreement. Indeed, it is this interest obligation—which

continues to run between JPMCB and Petersen—that is singularly important for purposes of

Section 85. By that section, a national bank has a federally authorized right to charge and export

an interest rate.  That right remains with JPMCB here, and it is that interest that Petersen seeks to restrict through New York usury law.  In short, regardless of whether JPMCB sold the receivables on Petersen's account, for purposes of Petersen's usury and parallel state-law claims, the real party in interest is JPMCB.  Under settled NBA preemption law, that fact controls and Petersen's claims are preempted.  *See Madden*, 786 F.3d at 252 (preemption applies when "'the real party in interest is the bank'" (quoting *Krispin*, 218 F.3d at 924)).  The limitation on the scope of Section 85 preemption that *Madden* recognized has no applicability here.

### C.     Courts Have Repeatedly Rejected Attacks On Securitizations Like Petersen's

The Complaint reprises a frequently made—and uniformly rejected—argument: that the securitization of credit-card receivables severs the relationship between an issuing bank and the credit-card account.  Courts have explained that this premise is "fundamentally flawed," and the body of case law rejecting it further underscores that *Madden* has no application here.

In *Scott v. Bank of America*, for example, the issuing bank (BoA) securitized the receivables from Scott's credit-card account and sold them to a trust.  580 F. App'x at 56.  After BoA charged off Scott's account, it sold the account to a debt buyer, which then sought to collect the outstanding balance.  *Id.* at 56-57.  Scott filed suit, alleging that BoA had nothing to transfer to the debt collection agency once it securitized the receivables, and so the collection agency's attempts to collect on her debt were unlawful.  *Id.* at 57.  The Third Circuit affirmed the dismissal of Scott's complaint because "the critical premise on which Scott's claims rely—that once a credit card company securitizes the receivables of a credit card account, it no longer retains an ownership interest in the account—is incorrect."  *Id.*  The court explained that "[c]redit card securitization involves the securitization solely of the receivables, not of the accounts themselves," and that "even after securitization the card issuer retains an ownership interest in the account."  *Id.*

15

Similarly, the plaintiff in *Willard v. Bank of America* argued that "by securitizing the credit card receivables and selling them to Wilmington Trust, BOA relinquished its beneficial interest in the entire credit card account and she no longer owed a debt to BOA." 204 F. Supp. 3d 829, 831 (E.D. Pa. 2016). The district court rejected her claims, finding that they all flowed from a "fundamentally flawed" premise that the securitization of credit-card receivables changes the relationship between a debtor and a creditor. *Id.* at 833. Collecting cases, the court noted that "every time this argument has arisen across the country, it has been rejected." *Id.* at 833 & n.4 (citing cases). New York law is consistent, *see Am. Exp. Bank FSB v. Najieb*, 4 N.Y.S.3d 6, 7 (N.Y. App. Div. 2015) ("The securitization of plaintiff credit card issuer's receivables did not divest it of its ownership interest in the account[.]"), and courts across the country have reached the same result, *see Davidson v. Capital One Bank (USA), N.A.*, 44 F. Supp. 3d 1230, 1243 n.16 (N.D. Ga. 2014) ("The securitization of receivables does not change the relationship between a debtor and creditor."), *aff'd*, 797 F.3d 1309 (11th Cir. 2015); *Sepehry-Fard v. Dep't Stores Nat'l Bank*, 2013 WL 6574774, at *4 (N.D. Cal. Dec. 13, 2013) ("[N]umerous courts have held that simply because a debt is securitized, that does not mean that the original beneficiary or owner of the credit account … can no longer enforce its right to collect upon that debt."), *aff'd in part*, 670 F. App'x 573 (9th Cir. 2016).

The rationale of those cases applies here as well. The securitization of Petersen's credit-card receivables does not divest JPMCB of its interest in his credit-card account, nor does it change the relationship between Petersen and JPMCB. As discussed above (at 6-7), JPMCB continues to own Petersen's credit-card accounts. Accordingly, the entire premise of the Complaint is "fundamentally flawed." Because JPMCB continues to retain an interest in Petersen's credit-card account, the NBA precludes state law—whether pleaded as a statutory

16

usury claim or a common-law unjust enrichment claim—from dictating the amount of interest Petersen pays on his credit-card loans.

As in *Scott*, *Willard*, and the numerous other cases cited, and for the same reasons given by those courts, Petersen's premise here—that by securitizing credit-card receivables, a bank surrenders its ownership of the account and its federally authorized power to charge interest—is flawed and should be rejected. Petersen offers no argument for why this Court should be the first to treat a securitization of receivables as surrendering all interest in an account. Rather, these securitization cases confirm JPMCB's continuing interest in Petersen's account; under *Madden*, then, the NBA completely preempts Petersen's usury claims.

### D.   The Application Of New York Law Here Also Is Preempted Because It Would Significantly Interfere With JPMCB's Federally Authorized Power To Deal In Loans (Here, Through Securitization Of The Loans' Receivables)

For the reasons discussed, Petersen's New York state usury law claims are expressly and completely preempted by Sections 85 and 86 of the NBA, which provide an exclusive federal cause of action for usury claims against a national bank. Petersen's claims are preempted for a second, distinct reason—because requiring a national bank to comply with state usury law when it securitizes credit-card receivables would substantially interfere with its exercise of federally authorized lending powers.

Beyond the enumerated power to set interest rates, the NBA authorizes national banks to exercise "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24(Seventh). Among those is the power to "make, sell, … or otherwise deal in loans" not secured by real estate, "subject to such terms … prescribed by … Federal law." 12 C.F.R. § 7.4008(a). And beyond the express preemption of state usury laws discussed above, the NBA generally preempts any consumer financial state law that "prevents or significantly interferes with the exercise by [a] national bank of its powers." 12 U.S.C. § 25b(b)(1). That

provision codifies the Supreme Court's decision in *Barnett Bank of Marion County, N.A v. Nelson*, which held that a state law may significantly interfere with a national bank's exercise of its powers even if it does so only indirectly.  517 U.S. at 37.

In *Madden*, the Second Circuit found that applying state usury laws to third-party debt buyers would not significantly interfere with a national bank's ability to exercise its powers under the NBA.  786 F.3d at 251 (citing *Barnett Bank*, 517 U.S. at 33).  "Rather, such application would 'limit [] only activities of the third party which are otherwise subject to state control,' and which are not protected by federal banking law or subject to OCC oversight."  *Id.* (internal citation omitted).  Although usury laws "might decrease the amount a national bank could charge for its consumer debt in certain states, … such an effect would not 'significantly interfere' with the exercise of a national bank power."  *Id.*

At issue in this case is not whether national banks are able to charge less when they sell charged-off loans, as was the case in *Madden*.  Rather, at issue here is the securitization of active and open loans in good standing, which national banks do in order to finance their own, ongoing lending operations.  As the Federal Deposit Insurance Corporation (FDIC) has explained:

> Securitizations, when used properly, provide financial institutions with a useful funding, capital, and risk management tool.  By using securitizations, a credit card issuer may be able to obtain lower cost funding, diversify its funding sources, improve financial indices, potentially lower regulatory costs, and increase its ability to manage interest rate risk.  In addition, securitizations may allow banks to reduce asset-class concentrations in the overall portfolio, create underwriting and pricing discipline (provide market feedback regarding asset value), and leverage origination skills and systems capacity by increasing the volume of transactions that pass through the bank.  In addition, servicing is often retained by the originator which minimizes customer disruption and enhances fee income.

FDIC, Credit Card Securitization Manual, *Introduction* (2007).[8]  A holding that credit card-

---

[8]      https://www.fdic.gov/regulations/examinations/credit_card_securitization/index.html.
The Court may consider the manual because it is a government publication available on a

issuing national banks must comply with state usury laws if they securitize the credit-card loans

that they originate and own would allow state law to dictate the terms on which those banks can

securitize receivables.  That would diminish the income stream for securitization trust investors,

freezing up securitization markets, with disastrous effects for credit-card lending.  Indeed, the

OCC has explained that a comparable rule was preempted under the NBA because it would

"stand as an obstacle to the exercise of national banks' real estate lending powers, including the

power to sell real estate loans into the secondary market or to securitize these loans."  Office of

the Comptroller of the Currency, *Preemption Determination and Order*, 68 Fed. Reg. 46,264-02,

46,278-46,279 (2003).

In short, requiring that JPMCB lower the rates on credit cards from their permissible rates

to the rates required by state law when it securitizes receivables would run afoul of governing

federal law providing that a "national bank may make, sell, … or otherwise deal in loans" not

secured by real estate, "subject to such terms … prescribed by … Federal law," 12 C.F.R.

§ 7.4008(a), and would "significantly interfere[] with the exercise by [a] national bank of its

powers," 12 U.S.C. § 25b(b)(1).

## II.     Even If New York Usury Law Applied—And It Does Not—Petersen's Claims Fail

Petersen's New York usury claims fail for a second, independent reason.  The starting

premise for Petersen's Complaint is that *Madden* controls here; because NBA preemption is

inapplicable under *Madden*, he contends, New York usury law governs and sets the limit for his

interest rates.  Petersen's reliance on *Madden* is misplaced for the reasons discussed.  Even

setting *Madden* aside, however, Petersen also misconstrues New York usury law, which provides

that a loan that is not usurious when made cannot become usurious on account of any subsequent

---

government website.  *See Wells Fargo Bank*, 127 F. Supp. 3d at 166.

event.  Under that settled rule, the securitization of the receivables associated with Petersen's account cannot render the interest rate charged on that account usurious.

For nearly two centuries, New York courts have recognized that "a contract not tainted with usury in its inception will not be affected by subsequent usurious transactions in connection therewith."  *Salter v. Havivi*, 215 N.Y.S.2d 913, 919 (N.Y. Sup. Ct. 1961); *see also Cram v. Hendricks*, 7 Wend. 569, 572 (N.Y. Sup. Ct. 1831) (where a financial instrument "was free from usury between the original parties to it, no subsequent transaction with another person can, as it respects those parties, invalidate it"); *Rice v. Mather*, 3 Wend. 62, 64-65 (N.Y. Sup. Ct. 1829) ("Usury to invalidate the note, must exist between the original parties to it.").[9]  This is a broadly recognized common-law principle, and it establishes that "if the interest rate in the original loan agreement was non-usurious, the loan cannot become usurious upon assignment."  *In re Rent-Rite Superkegs West, Ltd.*, 2019 WL 2179688, at *15 (Bankr. D. Colo. May 20, 2019); *see also Nichols v. Fearson*, 32 U.S. 103, 109 (1833) ("[A] contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction."); *Gaither v. Farmers & Mechs. Bank of Georgetown*, 26 U.S. 37, 43 (1828) (where "the note [was] free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury"); *In re Donnay*, 184 B.R. 767, 780 (Bankr. D. Minn. 1995) ("The general rule is that a contract must charge unlawful interest at its inception to violate the usury law.").

This principle bars Petersen's New York usury claims.  There is no dispute that

---

[9]      Petersen's cardmember agreement with JPMCB provides that Delaware law governs his account, and the defendants maintain that Delaware law governs this dispute to the extent state law is relevant at all.  The Court need not undertake any choice-of-law analysis, however, because Delaware usury law, like New York law, recognizes the valid-when-made principle. *See, e.g.*, *State v. Bankers Fin. Corp.*, 26 A.2d 220, 227 (Del. Ct. Gen. Sess. 1942) ("Charges which are proper and unexceptionable at the time of their being made can not become, by subsequent events, so illegal as to have constituted a crime at the inception of the contract.").

20

Petersen's credit-card loan was valid when made, subject to an interest rate that JPMCB, the originating national bank, was authorized to charge.  Petersen's entire argument is that transfer of the receivables associated with his account to the defendants renders the very same interest rates usurious by virtue of the defendants not being national banks.  But under two centuries of settled New York law, because the interest rate charged on his account was valid when the loan was made, no subsequent securitization could suddenly render the rate usurious.  *See, e.g.*, *Munn v. Comm'n Co.*, 15 Johns. 44, 55 (N.Y. Sup. Ct. 1818) ("[A]s the bill was free from usury, between the immediate parties to it, no after transaction with another person can, as respects those parties, invalidate it.").[10]

### III.   Petersen's Usury Claim Is Partially Time Barred And His Unjust Enrichment Claim Should Be Dismissed

Finally, even if the Court does not find that Petersen's claims are preempted by the NBA, his statutory usury claim is partially time-barred and his unjust enrichment claim should be dismissed as duplicative of the usury claim.

Petersen's usury claim arises under New York GOL § 5-501, and is subject to a one-year statute of limitations, N.Y. C.P.L.R. § 215(6).  *See also Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 540 (2d Cir. 2018) (state claims of usury are subject to Section 215(6)'s one-year statute of limitations).  Accordingly, Petersen's statutory usury claim is "time-barred

---

[10]     *Madden* did not address, much less foreclose, this New York law argument.  *Madden* addressed only a question of federal law—whether preemption under the NBA continued to apply to loans assigned to a non-bank third party.  (The defendants preserve the argument that *Madden* erred in concluding that it does not.)  The Second Circuit did not address, however, whether Madden's claims were viable under applicable state law.  To the contrary, in arguing to the Supreme Court that *Madden* was incorrectly decided, the United States and the OCC explained that Midland "could prevail on remand if [state] usury law itself incorporates the valid-when-made principle" just discussed.  U.S. Br., *Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343 (U.S. May 24, 2016), at *19-20.

insofar as it [seeks] recovery of that amount paid to [the defendants] more than one year before the []claim was interposed." *Rebeil Consulting Corp. v. Levine*, 617 N.Y.S.2d 830, 831 (2d Dep't 1994).

Petersen purports to sue on behalf of a class of JPMCB cardholders over a six-year period, seeking to take advantage of the supposedly longer limitations period for unjust-enrichment claims. Compl. ¶¶ 88, 100-103.[11] But an unjust-enrichment claim "'is not a catchall cause of action to be used when others fail,'" and so courts "ha[ve] dismissed such claims where they are duplicative of other claims." *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 227 (E.D.N.Y. 2015) (quoting *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)), *aff'd*, 630 F. App'x 61 (2d Cir. 2015).

Petersen's unjust-enrichment claim is entirely duplicative of his statutory usury claim. *Compare* Compl. ¶¶ 98, 99 (statutory usury claim), *with id.* ¶¶ 101, 103 (substantively identical allegations for unjust-enrichment claim). Because there is no "set of facts upon which [the plaintiff] would fail to establish his … statutory claim[], but nonetheless succeed in proving unjust enrichment," *Silva v. Smucker Nat. Foods, Inc.*, 2015 WL 5360022, at *12 (E.D.N.Y. Sept. 14, 2015), the unjust-enrichment claim should be dismissed. *See also Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479-80 (S.D.N.Y. 2016) (Because the "plaintiffs articulate no theory of unjust conduct independent of the alleged acts" underlying the plaintiffs' other claims,

---

[11] Given that the Complaint proposes a class period beginning in June 2013, Compl. ¶ 88, Petersen appears to believe that the statute of limitations on his unjust-enrichment claim is six years. Not so. Where, as here, "the unjust enrichment claim is merely incidental to or duplicative of another claim with a shorter limitations period, the Court will not allow a plaintiff to avail himself of the longer limitations period." *Slinin v. Shnaider*, 2017 WL 464426, at *5 (S.D.N.Y. Feb. 2, 2017) (Sullivan, J.). Because his unjust-enrichment claim is entirely duplicative of his statutory usury claim, to the extent the former claim survives notwithstanding its duplicativeness, it too is subject to a one-year statute of limitations.

the unjust enrichment claim is "derivative and duplicative."); *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 295 (E.D.N.Y. 2010) (dismissing unjust enrichment claim as duplicative of statutory claim).

The fact that some forms of unjust-enrichment claims may have longer statutes of limitations than a statutory usury claim does not make the unjust-enrichment claim any less duplicative. *See Silva*, 2015 WL 5360022, at *12 ("[T]he fact that unjust enrichment has a longer statute of limitations than [the plaintiff's] other claims is a thin reed upon which to find it non-duplicative.").  "In applying the Statute of Limitations, courts must look to the essence of the claim, and not to the form in which it is pleaded."  *Green Bus Lines, Inc. v. Gen. Motors Corp.*, 565 N.Y.S.2d 124, 125 (2d Dep't 1991).  This is because "[a]ny one wrong may provide an injured party with several possible theories of action … [but] a plaintiff can have but one recovery for one wrong."  *European Am. Bank v. Cain*, 436 N.Y.S.2d 318, 320-21 (2d Dep't 1981).  Petersen's unjust-enrichment claim boils down to an allegation that the defendants violated New York's statutory usury cap.  Petersen "cannot avoid the [one]-year statute of limitations by asserting other claims, based on the same facts, that really sound in" usury. *Kapernekas v. Brandhorst*, 638 F. Supp. 2d 426, 429 (S.D.N.Y. 2009); *see also Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007) ("[I]f the unjust enrichment claim is merely incidental to or duplicative of another claim with a shorter limitations period, the Court will not allow a plaintiff to avail himself of the longer limitations period.").

## CONCLUSION

Petersen's claims are preempted by the NBA.  And because "there is no way for [Petersen] to reformulate the [Complaint] in a way that is not preempted, any attempt at re-pleading would be futile."  *S & R Dev. Estates, LLC v. Town of Greenburgh*, 336 F. Supp. 3d 300, 316 (S.D.N.Y. 2018).  The Court should dismiss the Complaint with prejudice.

Dated: August 6, 2019                               Respectfully submitted

                                                    /s/ Noah A. Levine
                                                    Noah A. Levine
                                                    Alan E. Schoenfeld
                                                    Wilmer Cutler Pickering Hale and Dorr
                                                    LLP7 World Trade Center
                                                    250 Greenwich Street
                                                    New York, NY 10007
                                                    Tel: (212) 230-8800
                                                    Fax: (212) 230-8888

                                                    *Attorneys for Defendants*