# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

DAVID PETERSEN, WAYNE
LITCHFIELD, CHRISTY OGRODOSKI,
LINDA JOHNSON, and WILLIAM
COHEN, individually and on behalf of all
others similarly situated,

             Plaintiffs,

      v.

CHASE CARD FUNDING, LLC, CHASE
ISSUANCE TRUST, and WILMINGTON
TRUST COMPANY, as Trustee of Chase
Issuance Trust,

             Defendants.

Case No. 19 Civ. 00741 (LJV)

---

**BRIEF OF *AMICI CURIAE* THE BANK POLICY INSTITUTE**
**AND THE STRUCTURED FINANCE ASSOCIATION**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

*Page*

**INTEREST OF *AMICI CURIAE***.................................................................1

**PRELIMINARY STATEMENT** ...................................................................2

**DISCUSSION** .............................................................................................3

**I. SECURITIZATION IS CRITICAL TO THE HEALTH OF THE LENDING MARKETS AND, MORE BROADLY, THE NATIONAL AND STATE ECONOMIES**.........................................................................................3

    A.    The Structure of Securitizations............................................. 3

    B.    The Structure of the Securitization at Issue Here Is Consistent With the Typical Structure of Credit Card Securitizations by Numerous Other Banks........................................................................................... 7

    C.    Securitizations Create Opportunities for Investors While Reducing Costs for Borrowing Households and Businesses ........................... 8

    D.    Securitization Is a Widespread Practice in the Economy ................... 12

**II. THE NBA HAS LONG PREEMPTED THE APPLICATION OF STATE USURY LAWS TO LOANS ORIGINATED BY NATIONAL BANKS, EVEN AFTER THOSE LOANS ARE SECURITIZED** .............................13

    A.    Courts Have Unanimously Held That a Loan's Securitization Does Not Affect Congress' Clear Preemption of State Usury Laws for National Banks.......................................................................................... 13

    B.    The Application of State Usury Laws to Securitized Loans Is Also Preempted Under the Dodd-Frank Act Because It Would Significantly Interfere With National Banks' Power to Make and Securitize Loans................. 16

**III. A RULING THAT THE NBA DOES NOT PREEMPT STATE USURY LAWS FOR SECURITIZED LOANS WILL SIGNIFICANTLY IMPAIR LENDING MARKETS**...............................................................19

    A.    Requiring National Banks to Comply With Dozens of State Usury Laws Would Restrict the Availability of Credit ............................................. 19

    B.    The Banking Industry and Investors Have Relied on the Continued Application of NBA Preemption to Securitizations................................ 22

**CONCLUSION** ...........................................................................................23

# TABLE OF AUTHORITIES

*Page(s)*

**Cases:**

*Barnett Bank of Marion Cty., N.A.* v. *Nelson*,
    517 U.S. 25 (1996)................................................................................17

*Beneficial Nat'l Bank* v. *Anderson*,
    539 U.S. 1 (2003)..................................................................................14

*Cole* v. *Stephen Einstein & Assocs., P.C.*,
    365 F. Supp. 3d 319 (W.D.N.Y. 2019).................................................13

*Discover Bank* v. *Vaden*,
    489 F.3d 594 (4th Cir. 2007) ...............................................................13

*Greenwood Tr. Co.* v. *Massachusetts*,
    971 F.2d 818 (1st Cir. 1992).................................................................13

*Krispin* v. *May Dep't Stores Co.*,
    218 F.3d 919 (8th Cir. 2000) ...............................................................14

*Madden* v. *Midland Funding, LLC*,
    786 F.3d 246 (2d Cir. 2015)..................................................................15

*Marquette Nat'l Bank of Minneapolis* v. *First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978)........................................................................13, 14

*Olvera* v. *Blitt & Gaines, P.C.*,
    431 F.3d 285 (7th Cir. 2005) ...........................................................18, 19

*Payne* v. *Tennessee*,
    501 U.S. 808 (1991)..............................................................................23

*Phipps* v. *F.D.I.C.*,
    417 F.3d 1006 (8th Cir. 2005) .............................................................14

*Scott* v. *Bank of Am.*,
    580 Fed. App'x 56 (3d Cir. Nov. 3, 2014).............................................15

*Strike* v. *Trans-West Discount Corp.*,
    155 Cal. Rptr. 132 (Cal. Ct. App. 1979)...............................................18

*Tiffany* v. *Nat'l Bank of Mo.*,
    85 U.S. 409 (1873)................................................................................13

*Willard* v. *Bank of Am.*,
    204 F. Supp. 3d 829 (E.D. Pa. 2016) ...................................................................15

**Statutes:**

12 U.S.C. § 25b(b)(1)(B) ...................................................................................17, 19

12 U.S.C. § 85 .......................................................................................................13

12 U.S.C. § 86 .......................................................................................................13

12 U.S.C. § 1463(g) ...............................................................................................13

12 U.S.C. § 1785(g) ...............................................................................................13

12 U.S.C. § 1831d ..................................................................................................13

15 U.S.C. § 78o-11(b)(1) .....................................................................................5, 16

2002 Ga. Laws 455, § 7-6A-6 ...............................................................................21

2003 Ga. Laws 1, § 1 .............................................................................................22

Conn. Gen. Stat. § 37-8 ........................................................................................21

Mich. Comp. Laws Ann. § 438.41 .........................................................................21

N.Y. Gen. Oblig. Law § 5-511 ..............................................................................21

N.Y. Penal Law § 190.40 .......................................................................................21

**Other Authorities:**

12 C.F.R. § 7.4008(a)............................................................................................17

12 C.F.R. § 34.3(a)................................................................................................17

17 C.F.R. §§ 246.1 *et seq.*......................................................................................6

Bd. of Governors of the Fed. Reserve Sys., *Report to the Congress on Risk
    Retention* (2010)............................................................................................3–6, 8, 9

Bd. of Governors of the Fed. Reserve Sys., *Statistical Release G.19: Consumer
    Credit June 2019* (2019) ..................................................................................10

Bonnie Buchanan, *Back to the Future: 900 Years of Securitization*,
    15 J. Risk Fin. 316 (2014)..................................................................................3

Burcu Duygan-Bump *et al.*, *Financing Constraints & Unemployment: Evidence from the Great Recession* (Fed. Reserve Bank of Bos. Working Paper No. QAU10-6, 2011) ...................................................................................................20

Comptroller of the Currency, *Asset Securitization: Comptroller's Handbook* (1997)..............................................................................................................8, 10

Fed. Deposit Ins. Corp., *Credit Card Securitization Manual* (2007) ...............................4–6, 9, 11

Fed. Reserve Bank of N.Y., *Quarterly Report on Household Debt and Credit 2019:Q1* (2019)...........................................................................................................12

Fed. Reserve Bank of Phila., *Asset-Backed Securities and Credit Cards: Update* (2004)...........................................................................................................11

FitchRatings, *Credit Card ABS Rating Criteria* (2019)............................................................5, 6

Henry Unger & Robert Luke, *Compromise Reached on Georgia Lending Law*, Atlanta J.-Const., Feb. 1, 2003.....................................................................................22

James A. Wilcox, *Securitization and Small Business* (Fed. Reserve Bank of S.F., Economic Letter 2011-22, 2011) ...............................................................................10

James McAndrews, Exec. Vice President & Dir. of Research, Fed. Reserve Bank of N.Y., Credit Growth and Economic Activity After the Great Recession, Remarks at the Economic Press Briefing on Student Loans (Apr. 16, 2015).........................20

James van Opstal, *Funding Credit Card Loans: Current and Future Considerations* (2013) (Fed. Reserve Bank of Phila. Discussion Paper) ..................................9

Karen Gordon Mills & Brayden McCarthy, *The State of Small Business Lending: Innovation and Technology and the Implications for Regulation* (Harvard Bus. Sch. Working Paper No. 17-042, 2016)............................................................................20

Michael Staten, *The Impact of Credit Price and Term Regulations on Credit Supply* (Joint Ctr. for Hous. Studies of Harvard Univ. Working Paper No. UCC08-8, 2008).............................................................................................................20

Preemption Determination and Order, 68 Fed. Reg. 46,264-02 (Aug. 5, 2003) .................................................................18

Robert McKinley, *Second-Quarter Card Volume for Major 4 Falls 100 bps*, CardFlash (Aug. 2, 2019).......................................................................................10

Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-abs-issuance-and-outstanding/ ...................1, 12

Sec. Indus. & Fin. Mkts. Ass'n, *US Mortgage-Related Issuance and Outstanding*
(July 1, 2019), https://www.sifma.org/resources/research/us-mortgage-related-
issuance-and-outstanding/ ...................................................................................1, 12

Sec. Indus. & Fin. Mkts. Ass'n, *US SF Trading Volume* (August 1, 2019),
https://www.sifma.org/resources/research/us-sf-trading-volume/ ..........................12

U.S. Dep't of the Treasury, *A Financial System That Creates Economic*
*Opportunities: Capital Markets* (2017) .............................................................3, 11

*Amici Curiae*, the Bank Policy Institute ("BPI") and the Structured Finance Association ("SFA"), by their counsel Sullivan & Cromwell LLP and Mayer Brown LLP, respectfully submit this brief in support of Defendants' Motion to Dismiss.[1]

## INTEREST OF *AMICI CURIAE*

BPI is a nonpartisan public policy, research, and advocacy group, representing the nation's leading banks. BPI's members include universal banks, regional banks, and major foreign banks doing business in the United States. Collectively, BPI members employ nearly two million Americans, make 72% of all loans, including nearly half of the nation's small business loans, and serve as an engine for financial innovation and economic growth.

SFA is a member-based trade industry advocacy group focused on improving and strengthening the structured finance and securitization market. SFA has over 360 members representing all sectors of the securitization market, including investors, issuers, financial intermediaries, law firms, accounting firms, technology firms, rating agencies, servicers, and trustees. SFA's core mission is to support a robust and liquid securitization market, recognizing that securitization is an essential source of core funding for the real economy. As of the end of 2018, securitization transactions were the source of more than $11.3 trillion in funding for the U.S. economy.[2] This amount represented more than 50% of aggregate outstanding U.S. household

---

[1]     No counsel for any party authored this brief in whole or in part, and no person other than *Amici* or their counsel contributed any money to fund its preparation or submission. Neither of the *Amici* is a subsidiary or affiliate of any publicly-owned corporation.

[2]     *See* Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-abs-issuance-and-outstanding/; Sec. Indus. & Fin. Mkts. Ass'n, *US Mortgage-Related Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-mortgage-related-issuance-and-outstanding/.

debt—including 69% of residential mortgage debt, 17% of automobile debt, 12% of student loan debt, and 14% of credit card debt.

*Amici*'s members—which include banks and other financial institutions that routinely originate, purchase, and securitize loans—have a substantial interest in this action, because Plaintiff's claims threaten to disrupt radically the multi-trillion dollar U.S. securitization market, which courts and regulators have long recognized as a cornerstone of the U.S. credit markets. Specifically, Plaintiff seeks to negate the long-standing federal preemption of state usury laws as to loans originated by national banks after their receivables are securitized, thus substantially undermining the ability of national banks and other lending institutions to securitize many types of consumer and small business debt and, in turn, leading to higher interest rates and a contraction in the availability of credit. *Amici* respectfully submit this brief in support of Defendants' motion to dismiss Plaintiff's claims with prejudice.

## PRELIMINARY STATEMENT

Securitization—the process of converting a stream of future income (such as payments on credit card debt) or other assets into cash by issuing securities that are backed by such income stream or other assets—is a long-standing and critical mechanism for expanding the availability of credit to all corners of the U.S. economy. Plaintiff's claims, if allowed to proceed, threaten the entire structure of securitization. In this brief, *Amici* explain to this Court (i) how securitizations work, why the securitization at issue in this case is consistent with general securitization practices, and how securitization is a widespread tool for the provision of credit throughout the United States, (ii) why the National Bank Act, the Dodd-Frank Act, and the Second Circuit's decision in *Madden* v. *Midland Funding* plainly preclude Plaintiff's argument that federal preemption of state usury law for loans originated by national banks no longer applies if the

receivables on those loans are securitized, and (iii) why adoption of Plaintiff's arguments here would dramatically upset the settled expectations of the lending industry and harm lenders, borrowers, and investors, as well as small businesses and individuals across the country.

## DISCUSSION

## I.    SECURITIZATION IS CRITICAL TO THE HEALTH OF THE LENDING MARKETS AND, MORE BROADLY, THE NATIONAL AND STATE ECONOMIES.

### A.    The Structure of Securitizations

The basic process of securitizing cash flows has existed as a financing tool for hundreds of years. *See* Bonnie Buchanan, *Back to the Future: 900 Years of Securitization*, 15 J. Risk Fin. 316 (2014). Securitizations have become a more prevalent feature in the lending markets since the 1970s, and have grown into a multi-billion dollar market sector.[3] At a high level, a securitization is built in five steps. For illustrative purposes, the process for a credit card securitization (the type at issue here) is explained below, but the process is similar for securitizations of other types of assets, including consumer loans and commercial loans.

*First*, a bank makes credit card loans to consumers and small businesses—in the securitization context, this is also called "originating" loans. In a typical credit card loan, a bank extends credit to a borrower in exchange for the borrower's promise to make payments of principal, interest, and fees—collectively known as "receivables."[4] Credit card receivables are severable from the underlying credit card account, which means that the originating bank retains ownership

---

[3]    *See* U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities: Capital Markets* 92–94 (2017) ("*Treasury Report*"), https://www.treasury.gov/press-center/press-releases/documents/a-financial-system-capital-markets-final-final.pdf.

[4]    *See* Bd. of Governors of the Fed. Reserve Sys., *Report to the Congress on Risk Retention* 19 (2010) ("*Board Report*"), https://www.federalreserve.gov/boarddocs/rptcongress/securitization/riskretention.pdf.

of the credit card account, the obligation to fund future credit card purchases, and the right to charge interest and fees, but can separately securitize (*i.e.*, finance) the cash flows from the borrower's payment of principal, interest, and fees on the loan.

*Second*, a "sponsor" identifies, or "designates," a number of credit card accounts and pools together the receivables from various loans originated in these accounts. The sponsor is typically the originating bank itself, but can also be an originating bank's affiliate or another entity that has purchased receivables from the originating bank.

*Third*, the sponsor sells the pool of receivables from the designated credit card accounts to an entity called the "depositor," which is typically a wholly owned but legally separate subsidiary of the sponsor. Note that in a credit card securitization, the sponsor sells the receivables and the right to purchase future receivables generated in the designated credit card accounts, but the originating financial institution retains the underlying credit card accounts.[5] The purpose of selling the receivables to the depositor before they are securitized is to separate legally (*i.e.*, isolate) the receivables from the originating financial institution, as securitization investors are looking to take on the risk and reward of the performance of the specific securitized assets, but not the credit risk of the originating bank or sponsor. *FDIC Manual*, *supra* note 5, at 5. This separation ensures that investors in the securitization are protected from the risk of the sponsor's potential insolvency, but it also means that investors can only look to the receivables for repayment of their investment. *Id.* at 10; *Board Report*, *supra* note 4, at 10. For this reason, the depositor is typically a "single purpose entity" (or "SPE") that has no assets other than the receivables and no liabilities, no

---

[5]    *See* Fed. Deposit Ins. Corp., *Credit Card Securitization Manual* 10–11 (2007) ("*FDIC Manual*"),                https://www.fdic.gov/regulations/examinations/credit_card_securitization/ pdf_version/index.html ("The financial institution retains legal ownership of the credit card accounts and can continue to change the terms on the accounts.").

employees, and no operations.  It acts solely as a conduit for transferring the receivables to the "issuer."

        *Fourth*, the depositor sells the receivables and the right to purchase future receivables from the credit card accounts to an "issuer," typically a trust.  The issuer is also an SPE, but, unlike the depositor, may not be a corporate affiliate of the sponsor or depositor.  *FDIC Manual*, *supra* note 5, at 9–10.  Through an investment bank underwriter, the issuer then sells interest-bearing securities (usually notes) to investors.  *Id.* at 8.  In this transaction, payment by the issuer on the investors' securities is "backed" by the receivables, which is why the securities are referred to as "asset-backed securities."  In other words, once credit card accounts are designated for a securitization, the funds from credit card borrowers' payment of principal, interest, and fees on those accounts are used to pay the interest and other amounts owed to investors on the securities.  *Id.* at 11–12.  Using the proceeds of the securities issuance, the issuer pays the depositor for the receivables, who in turn pays the sponsor.  *Id.* at 9.  "Credit card trusts typically require the transferor"—*i.e.*, the sponsor—"to maintain an ownership interest (referred to as the transferor's participation or seller's interest) in the trust, often in the range of 4%–7%."[6]  This requirement means that the sponsor will have continuing exposure to the credit performance of the securitized receivables after their sale, which is designed to "align[] the interests of the investor and the securitizer."  *Board Report*, *supra* note 4, at 45.[7]  Most sponsors of credit card securitizations satisfy the risk retention requirements by retaining a seller's interest in the asset portfolio.

---

[6]    *See* FitchRatings, *Credit Card ABS Rating Criteria* 15 (2019) ("*Fitch Criteria*"), https://www.fitchratings.com/site/re/10074846.

[7]    While this risk retention requirement has long been a feature of credit card securitizations, a similar requirement is now mandated under the Dodd-Frank Act for most securitizations.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act § 941(b), 15 U.S.C. § 78o-11(b)(1) (2012) (a "securitizer [is required] to retain an economic interest in a portion of the credit risk for any asset that the securitizer, through the issuance of an asset-backed security, transfers, sells, or

*Fifth*, the sponsor will often use the cash from the securities issuances, directly or indirectly, to make new advances to credit card holders (if the sponsor is the originating bank) or to buy new receivables from the originator (if the sponsor is a purchaser), which are then (through the same process described above) sold to the trust.  *See Board Report*, *supra* note 4, at 19; *FDIC Manual*, *supra* note 5, at 11–12.  The reason for this is that investors are typically interested in longer-term investments, and so asset-backed securities are often issued for durations of one or more years.  However, the typical credit card receivable lasts only several months (*i.e.*, most credit card borrowers repay loans in that time frame), and so the trust constantly acquires new receivables to pay interest and other amounts due on the securities.  *Fitch Criteria*, *supra* note 6, at 3; *FDIC Manual*, *supra* note 5, at 11.

The preceding steps are illustrated in the following diagram:

---

conveys to a third party”); *see also* 17 C.F.R. §§ 246.1–246.22 (implementing section 941 of the Dodd-Frank Act).



**B.   The Structure of the Securitization at Issue Here Is Consistent With the Typical Structure of Credit Card Securitizations by Numerous Other Banks.**

As described in the Complaint, the securitization at issue in this case was created using the same structure described above.  Plaintiff's credit card loans were originated by Chase Bank USA, N.A. ("Chase USA"), a national bank.[8]  As the sponsor of the securitization, Chase USA then sold the receivables associated with Plaintiff's accounts—but not the underlying accounts themselves—to the depositor, Defendant Chase Card Funding LLC.  Chase Card Funding

---

[8]     *See* Mem. in Supp. of Mot. to Dismiss by Defs. ("Mot. to Dismiss"), Dkt. No. 21-1, at 6 n.1.  On May 18, 2019, Chase USA was merged into JPMorgan Chase Bank, N.A., which is also a national bank.  *See id.*; Compl., Dkt. No. 1, ¶ 56 n.5.

LLC, in turn, transferred the receivables to Defendant Chase Issuance Trust, the issuer. Chase Issuance Trust then sold securities to investors, backed by the credit card receivables, and used the proceeds from the securities sales to pay Chase Card Funding LLC for the receivables it purchased. *See* Class Action Compl. ("Compl."), Dkt. No. 1, ¶¶ 57–59, 63; Mot. to Dismiss, Dkt. No. 21-1, at 6–7 & n.1.

Both the Complaint and the transaction documents governing the securitization at issue make clear that Chase USA's successor, JPMorgan Chase Bank, N.A. ("JPMCB"), is the owner of Plaintiff's credit card accounts. They also make clear that JPMCB is the entity with which Plaintiff has the lending relationship. *See* Mot. to Dismiss, at 6–7; *see also supra* Section I.A, at 3–4.

## C. Securitizations Create Opportunities for Investors While Reducing Costs for Borrowing Households and Businesses.

Prior to the advent of modern securitization techniques in the 1970s, banks that issued loans would typically hold them through the lifetime of the loan—known as "portfolio lending."[9] There were, however, several drawbacks to this model. Most significantly, with portfolio lending, a bank's funds available for loans were limited by the bank's deposits and debt, resulting in a necessary limitation on how many loans could be offered and how competitive the terms could be. Additionally, the process of lending and then holding the loans could expose banks to high levels of risk—for example, if a bank specialized in lending in a particular geographic or market sector, an economic downturn in that sector could place significant financial pressure on the bank. *See Board Report*, *supra* note 4, at 8–9. The development of modern securitization

---

[9]     Comptroller of the Currency, *Asset Securitization: Comptroller's Handbook* 2 (1997) ("*Comptroller's         Handbook*"),         https://www.occ.gov/publications/publications-by-type/comptrollers-handbook/asset-securitization/pub-ch-asset-securitization.pdf.

alleviated these problems and simultaneously created new economic opportunities for banks, borrowers, and investors.

For banks, securitization offered a new method to raise funds, allowing them to expand lending.  With this increased funding, the bank can "leverage origination skills and systems capacity by increasing the volume of transactions that pass through the bank," thus generating economies of scale.  *FDIC Manual*, *supra* note 5, at 5.  Indeed, securitization led to the development of a whole new class of competitors in the lending industry.  For example, in the credit card market, securitization facilitated the expansion of banks that focused primarily on credit card lending.[10]  Although banks typically retain (directly or indirectly) some interest in the securitized receivables and continue to be exposed in a more limited manner to the performance or credit risk of these receivables, securitization also offers banks a way to spread the risks inherent in portfolio lending.  For example, securitization "allows financial institutions that primarily originate loans to particular classes of borrowers, or in particular geographic areas, to limit concentrated exposure to these idiosyncratic risks." *Board Report*, *supra* note 4, at 8–9.  Similarly, securitization can be a critical aspect of a bank's diversified funding and liquidity strategy, as securitization allows a bank to convert receivables into cash, which can then be redeployed to provide additional credit to consumers and small businesses.  *See* Opstal, *supra* note 10, at 9; *Board Report*, *supra* note 4, at 8.

Lowering the cost to banks of financing credit card advances allows them to charge lower rates to consumers and small businesses.  From the outset of securitizations, they have

---

[10]     *See* James van Opstal, *Funding Credit Card Loans: Current and Future Considerations* 2 (2013) (Fed. Reserve Bank of Phila. Discussion Paper), https://www.phil.frb.org/-/media/consumer-finance-institute/payment-cards-center/publications/discussion-papers/2013/D-2013-November-Funding-Credit-Card-Loans.pdf.

reduced the cost of credit to borrowers.  *See, e.g.*, *Comptroller's Handbook*, *supra* note 9, at 5 ("Credit card lenders can originate very large loan pools for a diverse customer base at lower rates than if they had to fund the loans on their balance sheet.").  Moreover, additional sources of funding allowed banks to provide credit to underserved areas of the economy, including consumers and small businesses with lower credit scores that otherwise would lack access to the banking system. *Id.* (noting that securitization of credit card debt "significantly expanded both the availability of credit and the pool of cardholders").[11]

In fact, the widespread use of credit cards as a payment mechanism heightens their significance even beyond their utility as a source of credit.  Consumers depend upon revolving credit cards in virtually every aspect of their economic life.  In the second quarter of 2019 alone, the volume of credit card transactions using MasterCard, Visa, American Express, and Discover credit cards totaled $1.028 trillion in gross dollar volume in the United States,[12] and as of June 2019, there were $1.07 trillion in outstanding revolving consumer credit balances.[13]  Moreover, a substantial majority of consumer-facing businesses accept revolving credit cards as a primary means of payment.  Consumers who are excluded from credit card issuance are also effectively excluded from many aspects of the daily economy, from making online purchases, to renting a car or reserving a hotel room.

---

[11]    *See also* James A. Wilcox, *Securitization and Small Business* 2 (Fed. Reserve Bank of S.F., Economic Letter 2011-22, 2011), https://www.frbsf.org/economic-research/files/el2011-22.pdf ("[T]he growth of securitized markets has significantly increased access to credit for small businesses . . . .").

[12]    Robert McKinley, *Second-Quarter Card Volume for Major 4 Falls 100 bps*, CardFlash (Aug. 2, 2019), https://cardflash.com/news/2019/08/second-quarter-card-volume-for-major-4-falls-100-bps/ (citing data compiled by CardData).

[13]    See Bd. of Governors of the Fed. Reserve Sys., *Statistical Release G.19: Consumer Credit June 2019* 1 (2019), https://www.federalreserve.gov/releases/g19/current/g19.pdf.

Finally, securitization substantially benefits investors by making it easier to invest in the credit markets.  To start, securitization permits investment in a particular class of assets without exposure to the originator's credit risk.  For example, in the context of a credit card securitization, an investor is able to limit its credit risk to the performance of the receivables in a basket of credit card accounts, rather than being exposed to the credit risk of the originating bank. *See FDIC Manual*, *supra* note 5, at 5.  The investment opportunities made possible by securitization are particularly attractive for institutional investors—such as pension funds, insurance companies, fund managers, and domestic and foreign commercial banks—which need long-term, predictable cash flows.  *Id.* at 7.  Moreover, securitizations are attractive investments because of "their diversification benefits, liquidity, and yield." *Treasury Report*, *supra* note 3, at 18.[14]  Securitizations also offer a high degree of flexibility to investors because the payment streams and credit enhancements can be structured to meet investors' particular requirements or investment standards.

Because of securitizations' potential to create value for all of these participants in the credit markets, the U.S. Government has explicitly recognized that securitization "can be a vital financial tool to facilitate growth in our domestic economy," and that securitization should be viewed "as a byproduct of, and safeguard to, America's global financial leadership." *Treasury Report*, *supra* note 3, at 91.

---

[14]    *See also* Fed. Reserve Bank of Phila., *Asset-Backed Securities and Credit Cards: Update* 4 (2004), https://www.philadelphiafed.org/-/media/consumer-finance-institute/payment-cards-center/publications/update-newsletter/2004/winter/winter_2004.pdf?la=en ("AAA-rated credit card asset-backed securities provide higher yields for lower perceived risk than similarly rated corporate bonds.").

**D.**     **Securitization Is a Widespread Practice in the Economy.**

Given securitization's utility to investors, banks, consumers, and small businesses, securitization has grown to become a vital element of the national economy.  As of the end of the first quarter in 2019, there were over $11.37 *trillion* in outstanding mortgage-backed securities ("MBS") and asset-backed securities ("ABS"), of which about $119 billion were issued in credit card securitizations—the type of securitization at issue in this case.[15]  These totals have been fueled by robust issuances—in the second quarter of 2019 alone, there were over $500 billion in new MBS and ABS issuances, of which nearly $2.8 billion were issued in credit card securitizations. *Id.*  The MBS and ABS markets have also produced a healthy market in secondary trading, with the average daily trading volume for MBS and ABS exceeding $263 billion in the first quarter of 2019, including an average daily trading volume of $227 million for securities backed by credit card receivables.[16]

These levels of securitizations have allowed substantial investment into lending markets.  According to data released by the Federal Reserve Bank of New York, U.S. households hold $848 billion in credit card debt as of the end of the first quarter in 2019.[17]  As noted above, $119 billion of this debt—or approximately 14%—is held in credit card securitizations,

---

[15]     *See* Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-abs-issuance-and-outstanding/; Sec. Indus. & Fin. Mkts. Ass'n, *US Mortgage-Related Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-mortgage-related-issuance-and-outstanding/.

[16]     *See* Sec. Indus. & Fin. Mkts. Ass'n, *US SF Trading Volume* (August 1, 2019), https://www.sifma.org/resources/research/us-sf-trading-volume/.

[17]     See Fed. Reserve Bank of N.Y., *Quarterly Report on Household Debt and Credit 2019:Q1* (2019), https://www.newyorkfed.org/microeconomics/hhdc.html.

representing billions of dollars of loans that might not otherwise be made to households and businesses without the access to funding that securitizations provide.

## II.   THE NBA HAS LONG PREEMPTED THE APPLICATION OF STATE USURY LAWS TO LOANS ORIGINATED BY NATIONAL BANKS, EVEN AFTER THOSE LOANS ARE SECURITIZED.

### A.   Courts Have Unanimously Held That a Loan's Securitization Does Not Affect Congress' Clear Preemption of State Usury Laws for National Banks.

In passing the National Bank Act ("NBA") in 1864, "Congress intended to facilitate . . . a 'national banking system.'" *Marquette Nat'l Bank of Minneapolis* v. *First of Omaha Serv. Corp.*, 439 U.S. 299, 314–15 (1978) (quoting Cong. Globe, 38th Cong., 1st Sess. 1451 (1864) (statement of Rep. Hooper)).  To achieve this purpose, the NBA sought to insulate national banks from "the hazard of unfriendly legislation by the States." *Tiffany* v. *Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873).

Accordingly, under NBA Section 85, national banks are permitted to "charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located," 12 U.S.C. § 85 (2012), rather than complying with local law in every jurisdiction in which the bank lends.[18]  NBA Section 86 then provides the exclusive remedy for a bank's charging of interest at a rate greater than permitted by Section 85.  *Id.* § 86.  Courts have long

---

[18]    Although this case concerns a national bank, the same analysis would apply to an FDIC-insured state-chartered bank.  Section 27 of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831d (2012), "borrow[s] from . . . §85 and incorporate[s]" its language to "achieve[] parity between national banks and their state-chartered counterparts."  *Greenwood Tr. Co.* v. *Massachusetts*, 971 F.2d 818, 827 (1st Cir. 1992).  For this reason, courts have held that Section 85 of the NBA and Section 27 of the FDIA "should be interpreted the same way."  *Id.*; *accord Discover Bank* v. *Vaden*, 489 F.3d 594, 606 (4th Cir. 2007), *rev'd on other grounds*, 556 U.S. 49 (2009).  The preemption likewise applies to similar provisions governing savings associations, *see* 12 U.S.C. § 1463(g) (2012); *Cole* v. *Stephen Einstein & Assocs., P.C.*, 365 F. Supp. 3d 319, 333 (W.D.N.Y. 2019), and credit unions, *see* 12 U.S.C. § 1785(g) (2012).

-13-

recognized that together these two sections completely preempt the application of state usury law to loans originated by a national bank.  *See, e.g.*, *Beneficial Nat'l Bank* v. *Anderson*, 539 U.S. 1, 11 (2003) ("[T]here is . . . no such thing as a state-law claim of usury against a national bank."); *Marquette*, 439 U.S. at 318 & n.31 ("To the extent the enumerated federal rates of interest are greater than permissible state rates, state usury laws must, of course, give way to the federal statute.").

Plaintiff in this case does not dispute this well-settled law, but instead claims that when the receivables are securitized, Sections 85 and 86 no longer apply.  Not so.  As courts have recognized, when a national bank has a continuous interest in the loan or relationship with the borrower—which is the case here, as JPMCB owns the account, charges the interest on a loan, and indirectly owns an interest in the trust—state usury laws must give way to federal law, regardless of where the right to receive the principal and interest ends up.  For example, in *Krispin* v. *May Department Stores Co.*, 218 F.3d 919 (8th Cir. 2000), a bank sold the receivables from a credit card account to a non-bank department store.  When the borrower contested the credit card's interest rate under the state's usury laws, the Eighth Circuit held that the state law was preempted by the NBA.  The "store's purchase of the bank's receivables," the court reasoned, "does not diminish the fact that it is . . . the bank, and not the store, that issues credit, processes and services customer accounts, and sets such terms as interest and late fees."  218 F.3d at 924.  Similarly, in *Phipps* v. *F.D.I.C.*, 417 F.3d 1006 (8th Cir. 2005), the plaintiffs invoked state law to challenge various fees under a mortgage loan, including a "finder's fee" paid by the originating bank to a non-bank.  The plaintiffs argued that the finder's fee claim was not preempted because it was essentially paid to a non-bank.  The Eighth Circuit disagreed, relying on the fact that the national bank "was the lender that funded and made the loans and charged the fees."  *Id*. at 1013.

-14-

Attempting to circumvent this clear law, Plaintiff relies on the Second Circuit's decision in *Madden* v. *Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015). That reliance is mistaken. In *Madden*, a national bank issued the plaintiff's credit card account, but later wrote off the debt and sold the account (and all rights to it) to a third-party debt collector that was not a national bank. 786 F.3d at 248. In short, the national bank severed all ties to the account. The plaintiff then brought claims against the debt collector alleging that it had violated New York law by charging a usurious rate of interest on the plaintiff's credit card debt after her account was sold. *Id.*

In holding that NBA preemption did not apply to the debt collector, far from disavowing *Krispin* and *Phipps*, the *Madden* court acknowledged and distinguished them. As the Second Circuit explained, NBA preemption applied in *Krispin* because (as in this case), "notwithstanding the bank's sale of its receivables to [a non-bank], it retained substantial interests in the credit card accounts so that application of state law to those accounts would have conflicted with the bank's powers authorized by the NBA." *Madden*, 786 F.3d at 252 n.2. Likewise, the Second Circuit indicated that NBA preemption would apply in a case like *Phipps* where (like here) "the national bank was the entity that charged the interest to which the plaintiffs objected." *Id.* at 253.

In *Madden* then, the Second Circuit has clearly indicated that NBA preemption applies to situations where the originating bank retains some relationship to the loan, and that forecloses Plaintiff's claims in this case. In the securitization at issue here—like all credit card securitizations—the sponsoring bank retains complete ownership of the account, as well as the direct relationship with the borrower, even after the receivables are securitized. *See Scott* v. *Bank of Am.*, 580 Fed. App'x 56, 57 (3d Cir. Nov. 3, 2014); *cf. Willard* v. *Bank of Am.*, 204 F. Supp. 3d

829, 833 n.4 (E.D. Pa. 2016) (citing decisions by courts in the Fifth, Sixth, Ninth, and Eleventh

Circuits holding that a bank retains an interest in the loan even after securitization).  Indeed, a

feature of securitizations more broadly is that the originator retains some link to the loan.  For

example, for most securitizations, federal law "require[s] any securitizer"—*i.e.*, a sponsor—"to

retain an economic interest in a portion of the credit risk for any asset that the securitizer, through

the issuance of an asset-backed security, transfers, sells, or conveys to a third party."  15 U.S.C.

§ 78o-11(b)(1).  Securitized loans therefore fall precisely within the class of loans entitled to

preemption under *Madden*.[19]

> **B.**    **The Application of State Usury Laws to Securitized Loans Is Also Preempted Under the Dodd-Frank Act Because It Would Significantly Interfere With National Banks' Power to Make and Securitize Loans.**

Preemption under Sections 85 and 86 of the NBA aside, state usury law limits are

also preempted under the Dodd-Frank Act, which—codifying the standard adopted in *Barnett*

---

[19]    As Plaintiff points out in the Complaint, *Amici* do not endorse *Madden*, and they previously urged the U.S. Supreme Court to grant *certiorari* to review the decision.  *See* Compl., Dkt. No. 1, ¶¶ 81–83.  But Plaintiff also incorrectly points to *Amici*'s *amici* briefs before the Supreme Court as evidence that *Amici* somehow "conceded" that *Madden* would apply on the facts of this case.  *Id.*  Specifically, Plaintiff points to (1) a brief filed by SFA (under its former name, the Structured Finance Industry Group), which re-stated *Madden*'s holding that the NBA does not "preempt the application of state usury law to sales of bank loans to non-banks," *id.* ¶ 82 (quoting Brief of the Structured Finance Industry Group, Inc., *et al.* as *Amici Curiae* in Support of Petitioners*, Midland Funding, LLC* v. *Madden*, No. 15-610, at 3 (Dec. 10, 2015)); and (2) a brief filed by a predecessor of BPI, which explained that after *Madden*, "firms have removed loans made to borrowers in the Second Circuit from asset-backed securitizations due to usury concerns," *id.* ¶ 83 (quoting Brief of the Clearing House Association L.L.C. *et al.* as *Amici Curiae* Supporting Petitioners, *Midland Funding, LLC* v. *Madden*, No. 15-610, at 23 (Dec. 10, 2015)).  Neither brief in any way "concede[s]" that *Madden* applies to securitizations.  Instead, the briefs merely noted the Second Circuit's holding that NBA preemption does not apply when a bank transfers the entirety of its interest in a loan to a non-bank, identified the uncertainty in the market following *Madden*, and pointed out that some firms saw the risk—borne out by this lawsuit—that others might try to extend *Madden* improperly to the securitization context.  But for the reasons explained in this brief and Defendants' motion, that extension is entirely unwarranted.

*Bank of Marion County, N.A.* v. *Nelson*, 517 U.S. 25 (1996)—declares that "[s]tate consumer financial laws are preempted" if they "prevent[] or significantly interfere[] with the exercise by [a] national bank of its powers."   Dodd-Frank Act § 1044, 12 U.S.C. § 25b(b)(1)(B) (2012). Specifically, subjecting a national bank to the usury law limits of the numerous states in which it originates loans, if it wishes to retain the option to securitize those loans, would significantly interfere with the national bank's federally conferred power to "make, sell, purchase, participate in, or otherwise deal in loans . . . subject to such terms . . . prescribed by . . . Federal law."  12 C.F.R. § 7.4008(a); *see also* 12 C.F.R. § 34.3(a).

Securitizations and other secondary market transactions are based on the predicate that the same interest rate that the originating bank charged prior to securitization will continue to apply after securitization.  Indeed, securitizations are structured and their cash flows are modeled on this basis.  The value of a loan that a bank originates includes the interest that the bank can charge on the loan; uncertainty over the validity of the interest rate if the loan is securitized thus severely compromises the value of the loan.  In this way, subjecting securitized loans originated by a national bank to the usury laws of all the states where the loans were made would significantly interfere with a national bank's powers by compromising the substantial benefits conferred by Section 85 of the NBA.

If state usury limits applied to securitized loans, national banks would be forced to either (i) forgo loan securitization in order to maintain the benefits of preemption under Section 85; or (ii) originate loans in compliance with each individual state's usury law, in order to preserve the option of securitization.  Either alternative would substantially interfere with a bank's operations, in violation of 12 U.S.C. § 25b(b)(1)(B).

As to the first option, it is clear that effectively compelling banks to forgo securitizations would improperly intrude on their statutorily granted powers.  For example, when one state passed a law that expanded the scope of liability for assignees of certain mortgage loans, the OCC opined that the state law was inconsistent with "the exercise of national banks' real estate lending powers, *including the power . . . to securitize these loans*," and that the state law was therefore preempted.  Preemption Determination and Order, 68 Fed. Reg. 46,264-02, 46,278–79 (Aug. 5, 2003) (emphasis added).  Courts have reached similar conclusions.  *See, e.g.*, *Olvera* v. *Blitt & Gaines, P.C.*, 431 F.3d 285, 288–89 (7th Cir. 2005) (Posner, J.) (bank would be improperly "deprived" of power to transfer interest in loan if original interest rate could not be charged post-transfer); *Strike* v. *Trans-West Discount Corp*., 155 Cal. Rptr. 132, 139 (Cal. Ct. App. 1979) (restriction of bank's ability to access secondary loan market "would be disastrous in terms of bank operations and not conformable to the public policy" of exempting banks from usury laws).

As to the second option, subjecting national banks to a patchwork of dozens of state-law usury limits would impose an extraordinary burden on them.  For any loans that a bank might want to securitize at some point, it would have to forgo its rights under Section 85 and comply with the usury laws of each individual jurisdiction.  As a result, instead of employing standardized loan products and nationwide underwriting programs, national banks would be forced to establish different lending programs for each state.  Further, the question of state usury is not limited to a simple analysis of a stated percentage rate (or, often, rates); it also entails a detailed and complex analysis of what is deemed to constitute interest (*e.g.*, fees) for this purpose.  Employing state-specific lending programs would therefore significantly increase the costs and administrative burden of loan origination for the many banks that make loans to borrowers in multiple states.

Thus, applying state usury limits to securitized loans would significantly interfere with national banks' lending powers, regardless of whether banks seek to comply with those limits

-18-

in order to continue securitization or forgo securitization to retain their rights under Section 85. For this reason, Plaintiff's state usury law claims are preempted under 12 U.S.C. § 25b(b)(1)(B).

### III.   A RULING THAT THE NBA DOES NOT PREEMPT STATE USURY LAWS FOR SECURITIZED LOANS WILL SIGNIFICANTLY IMPAIR LENDING MARKETS.

#### A.   Requiring National Banks to Comply With Dozens of State Usury Laws Would Restrict the Availability of Credit.

The scope of Plaintiff's proposed outcome cannot be understated.  It would not be limited to the parties and securitizations at issue in this case, or even just the credit card securitization market more broadly.  Instead, the rule Plaintiff proposes—that all loans will suddenly be subject to dozens of state usury laws when their receivables are securitized—could affect trillions of dollars in outstanding MBS and ABS.

Aside from the intrusion on banks' statutorily granted powers discussed in Section II.B. above, the rule Plaintiff advocates for would negatively impact U.S. credit markets more broadly.  If banks could not securitize loans, or if their ability to do so was restricted, banks would be forced to reduce the amount of credit they extend and to increase the costs for the reduced amount of credit they do extend.  *See Olvera*, 431 F.3d at 288 (noting that restricting the right of banks to assign the loans they originate would cause creditors to "pass much of the higher expense on to their customers in the form of even higher interest rates" and would "make the credit market

operate less efficiently").[20]  The reduction in bank lending would result in higher borrowing costs and fewer borrowers being able to obtain credit, all to the detriment of the economy.[21]

Likewise, banks that choose to create separate lending programs to comply with each individual state's usury limits may be unwilling to extend credit to higher-risk borrowers in states with low interest-rate limits.  Loss rates and the other costs of providing credit mean that banks cannot profitably provide revolving credit cards to consumers with poor credit characteristics unless they charge interest rates higher than those permitted under some usury laws. If a state's allowable interest rate is not high enough to justify the increased risk involved in making loans to individuals and businesses with lower credit scores, banks will tighten underwriting standards and cease extending credit to those borrowers altogether.[22]

---

[20]    *See also* Karen Gordon Mills & Brayden McCarthy, *The State of Small Business Lending: Innovation and Technology and the Implications for Regulation* 32 (Harvard Bus. Sch. Working Paper No. 17-042, 2016), http://www.hbs.edu/faculty/Publication%20Files/17-042_30393d52-3c61-41cb-a78a-ebbe3e040e55.pdf (observing that when the market for the securitization of small-business loans froze up in the winter of 2008–2009, "[s]mall businesses, even those in good standing, were having credit lines pulled by banks who could not afford to extend the credit due to their sudden capital constraints").

[21]    *See* James McAndrews, Exec. Vice President & Dir. of Research, Fed. Reserve Bank of N.Y., Credit Growth and Economic Activity After the Great Recession, Remarks at the Economic Press Briefing on Student Loans (Apr. 16, 2015), https://www.newyorkfed.org/newsevents/ speeches/2015/mca150416 ("[T]he impairment of banks' ability to extend credit . . . has the potential to hinder investment and adversely affect the overall economy."); Burcu Duygan-Bump *et al.*, *Financing Constraints & Unemployment: Evidence from the Great Recession* 1 (Fed. Reserve Bank of Bos. Working Paper No. QAU10-6, 2011), https://www.bostonfed.org/publications/risk-and-policy-analysis/2010/financing-constraints-and-unemployment-evidence-from-the-great-recession.aspx ("Unlike larger firms, which have broader access to capital markets, small businesses are highly dependent on bank financing.  An important implication is that any kind of disruption in the flow of bank credit may have significant real effects on the labor market." (citation omitted)).

[22]    *See* Michael Staten, *The Impact of Credit Price and Term Regulations on Credit Supply* 9–14 (Joint Ctr. for Hous. Studies of Harvard Univ. Working Paper No. UCC08-8, 2008), http://www.jchs.harvard.edu/sites/jchs.harvard.edu/files/ucc08-8_staten.pdf (summarizing empirical work that finds rate ceilings decrease the availability of credit).

Further, the outcome of this case will impact the willingness of investors to participate in securitizations.  Instead of simply looking at whether the originating bank complied with Section 85—which allows a national bank to charge interest at a rate up to that allowed in the state where it is located—investors would need to evaluate the usury laws independently to determine which state's law applies, and how it applies, for every loan included in the securitization.  That is a hopelessly complex task, unworkable as a practical matter, not only because many securitizations have vast and heterogeneous pools of loans that would need to be evaluated against the evolving laws of fifty states, but also because state usury laws vary widely from state to state, often setting different interest rate limits and including different calculations of interest for different types of loans.  The costs of non-compliance with usury laws can be severe, including the loss of all interest and, in some cases, principal.  *See, e.g.*, N.Y. Gen. Oblig. Law § 5-511; Conn. Gen. Stat. § 37-8.  Indeed, many states impose criminal penalties for charging interest above certain levels.[23]  As a result, fewer investors will be willing or able to purchase securities backed by bank loans.  And those investors still willing to invest in securitizations backed by bank loans will likely require higher risk premiums, leading to higher borrowing costs and lower credit availability, especially for those with impaired credit history and small businesses that tend to be subject to higher interest rates.

The negative consequences of restricting securitization and other secondary market transactions are not just theoretical.  These aforementioned effects were felt in Georgia in the early 2000s after the state upended expectations in the secondary loan market by significantly expanding the scope of liability of mortgage assignees.  *See* 2002 Ga. Laws 455, § 7-6A-6.  In response,

---

[23]     *See, e.g.*, N.Y. Penal Law § 190.40 (interest in excess of 25% is a felony punishable by up to four years imprisonment and/or $5,000 fine); Mich. Comp. Laws Ann. § 438.41 (interest in excess of 25% is punishable by up to five years imprisonment and/or $10,000 fine).

ratings agencies ceased rating securities backed by mortgage loans originated in Georgia, explaining that they could not evaluate the potential risk to investors resulting from this law. *See* Henry Unger & Robert Luke, *Compromise Reached on Georgia Lending Law*, Atlanta J.-Const., Feb. 1, 2003, 2003 WLNR 19578731. Financial institutions refused to buy mortgage loans originated in Georgia, and a number of lenders withdrew or substantially limited their operations in the state—effectively shutting off vital sources of liquidity in the state's lending market. *Id.* Faced with an impending crisis and enormous harm to consumers, Georgia amended the law to limit assignee liability. *See id.*; 2003 Ga. Laws 1, § 1.

Similar effects will likely be felt in this District if this Court were to hold that NBA preemption does not extend to loans after their receivables are securitized. If Plaintiff's claims are allowed to continue, lenders' and investors' fears will be confirmed, and the availability of credit in the Second Circuit—and potentially beyond—is likely to deteriorate further. The Court should instead restore confidence to the markets by reaffirming the NBA's preemptive effect in the context of securitizations of loans originated by banks.

**B.    The Banking Industry and Investors Have Relied on the Continued Application of NBA Preemption to Securitizations.**

Finally, a ruling that NBA preemption does not apply to securitized loans would also have costly consequences for the many investors that have already purchased securities backed by debt receivables in reliance on the courts' long recognition of NBA preemption for securitizations. As noted in Section I.A. above, modern asset securitization has been occurring since the 1970s, and the basic practice of securitizing cash flows has existed as a financial tool for centuries. If claims like the ones brought by Plaintiff are allowed to go forward, securitization trusts and depositors could face a wave of legal disputes premised solely on their receiving interest payments as permitted in loan agreements.

*Amici* are not aware of any court decision that has identified any reason for treating securitized loans differently than loans in the originating bank's portfolio for purposes of state usury law preemption—indeed, when asked, courts have recognized that securitization does not change the basic relationship between a lender and borrower. *See supra* Section II.A.  Market participants therefore continue to invest hundreds of billions of dollars each year in new MBS and ABS based to some extent on the expectation that the courts will continue to apply NBA preemption to securitized loans.  *See supra* Section I.D.  This Court should be hesitant to upset these reasonable expectations.  *See Payne* v. *Tennessee*, 501 U.S. 808, 828 (1991) (noting that considerations in favor of adhering to earlier precedents "are at their acme in cases involving property and contract rights, where reliance interests are involved").

## CONCLUSION

For the foregoing reasons, this Court should hold that Plaintiff's claims are preempted by federal law.

Dated:  August 13, 2019

Respectfully submitted,

s/ Matthew A. Schwartz

H. Rodgin Cohen
Matthew A. Schwartz
Akash M. Toprani
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel.: (212) 558-4000
Fax: (212) 558-3588
schwartzmatthew@sullcrom.com

*Attorneys for* Amici Curiae *the Bank Policy Institute and the Structured Finance Association*

*Of Counsel for* Amicus Curiae *the Bank Policy Institute*

Gregg L. Rozansky
THE BANK POLICY INSTITUTE
600 13th Street N.W., Suite 400
Washington, D.C. 20005
Tel.: (202) 289-4322
gregg.rozansky@BPI.com


*Of Counsel for* Amicus Curiae *the Structured Finance Association*

Andrew Tauber
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
Tel.: (202) 263-3324
atauber@mayerbrown.com