UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DAVID PETERSON,

                Plaintiff,

    v.                                     19-cv-00741-LJV-JJM
                                         DECISION & ORDER

CHASE CARD FUNDING, LLC; CHASE
ISSUANCE TRUST; and WILMINGTON
TRUST COMPANY, *as Trustee of Chase
Insurance Trust*,

                Defendants.

_____


On June 6, 2019, the plaintiff, David Peterson, on behalf of himself and all others similarly situated,  commenced this class action under New York General Obligations Law § 5-501 and New York Banking Law § 14-a.  Docket Item 1.[1]  Peterson alleges that the defendants, Chase Card Funding, LLC; Chase Insurance Trust; and Wilmington Trust Company (collectively, "Chase"), "charge, collect, and receive usurious rates of interest from New York consumers . . . in excess of New York's usury cap."  *Id.* at 1.

On August 6, 2019, Chase moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Peterson's claims were preempted by the National Banking Act.  Docket Item 21.  Peterson responded on September 17, 2019, Docket Item 42; and Chase replied on October 8, 2019, Docket Item 45.  The Bank Policy Institute and the Structured Finance Association filed an amicus brief in

---

[1] Peterson originally was joined by four other plaintiffs—Wayne Litchfield, Christy Ogrodoski, Linda Johnson, and William Cohen—but their claims were dismissed voluntarily on August 2, 2019.  *See* Docket Items 19 and 20.

support of the defendants' motion on August 13, 2019.  *See* Docket Item 28-1.

Peterson responded to that brief on January 8, 2020.  Docket Item 56.

On October 11, 2019, the case was referred to United States Magistrate Judge

Jeremiah J. McCarthy for all proceedings under 28 U.S.C. §§ 636(b)(1)(A) and (B).

Docket Item 46.  Following oral argument on December 11, 2019, Judge McCarthy

solicited additional briefing on an administrative rule proposed by the United States

Comptroller of the Currency.  Docket Item 49.  The parties exchanged briefs on January

8, 2020.  Docket Items 54 (defendants) and 55 (Peterson).

On January 22, 2020, Judge McCarthy issued a Report and Recommendation

("R&R") finding that Chase's motion should be granted.  Docket Item 57.  On February

5, 2020, Peterson objected to the R&R on the grounds that Judge McCarthy erred in (1)

finding that application of New York's usury laws to Chase's credit card accounts would

"significantly interfere" with its exercise of a national bank power and (2) failing to

specifically find that nonparty JPMorgan Chase Bank is "located" in, and therefore

entitled to charge interest according to the laws of, Delaware.  Docket Item 60.  On

March 4, 2020, the defendants responded to the objections, Docket Item 66; and on

March 13, 2020, Peterson replied, Docket Item 67.  The Center for Responsible Lending

and the National Consumer Law Center filed an amicus brief on February 5, 2020.

Docket Item 62.  Peterson provided supplemental authority on June 10, 2020, Docket

Item 68; Chase responded to that submission on June 17, 2020, Docket Item 69.

A district court may accept, reject, or modify the findings or recommendations of

a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must

review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R, the record, the objection and responses, and the materials submitted to Judge McCarthy.  Based on that *de novo* review, the Court accepts and adopts Judge McCarthy's recommendation to grant the defendants' motion.  The Court does so for the specific reasons stated below.

### BACKGROUND

Petersen's unsecured credit card loans were originated by JPMorgan Chase Bank, N.A. ("JPMCB").  Docket Item 1 at 3, 9-10.[2]  JPMCB engages in a process called "securitization," whereby it sells all current and future receivables (including interest payments) generated by its credit card loan accounts to a non-bank entity.  *See Id.* at 7-10.  The purpose of selling the receivables is to "ensure that investors in the securitization are able to invest solely in the quality of the receivables and the risks specific to them, rather than the overall risks of [JPMCB]."  *Id.* at 8; *see also Scott v. Bank of Am.*, 580 F. App'x 56 (3d Cir. 2014) ("[Securitization]—a typical [move] by credit card issuers—'provides steady liquidity for card issuers' and 'transfer[s] most downside credit risk on the card.'" (quoting Adam J. Levitin, *Skin-in-the-Game: Risk Retention Lessons from Credit Card Securitization*, 81 Geo. Wash. L. Rev. 813, 817, 828 (2013))).

---

[2] Chase Bank USA, N.A., a national bank, originated and owned Petersen's account until May 18, 2019, when it merged into JPMCB.  *Id.* at 10 n.5.

JPMCB first sells the receivables to defendant Chase Card Funding, LLC ("Card Funding" or "the depositor"), a "shell company that has no employees and engages in no activity other than the purchase and re-sale of debts."  Docket Item 1 at 11.  Card Funding in turn sells the receivables to defendant Chase Issuance Trust ("the Trust"), a "single-purpose entity with no employees."  *Id.* at 11-13.  These sales are financed by the Trust's sale of asset-backed securities, the cash proceeds of which ultimately land with JPMCB.  *Id.* at 8, 10.

The Trust "contracts with" JPMCB to service the credit card loans.  *Id.* at 13. "The servicer's duties include billing, collecting[,] and investigating payment delinquencies on accounts . . . .  The servicer also deposits collections on the receivables into the collection account maintained" for the owner of the receivables. CHAIT A(2018-1) Prospectus 63 (May 4, 2018), https://www.jpmorgan.com/pdfdoc/jpmc/ir/chait_2018-A1_prospectus.pdf.  The Trust bears all expenses related to servicing the receivables.  *Id.* at 63-64.

JPMCB acknowledges that, as a result of securitization process, the receivables are "no longer . . . the property, assets[,] or rights of [JPMCB]."  Receivables Purchase Agreement ("RPA") § 2.01(e) (Jan. 20, 2016), https://www.sec.gov/Archives/edgar/data/1174821/000119312516434830/d102477dex4 4.htm.  JPMCB remains the owner of the "accounts" themselves, however.  For example, it "retains the right to change various terms and conditions of the credit card accounts," including "increasing or decreasing periodic interest charges."  Prospectus at 26, 46.  And, in the event of default, the Trust "automatically . . . sell[s], transfer[s], set[s] over, and otherwise convey[s]" to Card Funding, which in turn "automatically transfer[s],

4

set[s] over, and otherwise convey[s]" to JPMCB, "all the right, title and interest . . . in and to the [r]eceivables in such [d]efaulted [a]ccount." RPA § 3.05; Fourth Amended and Restated Transfer and Servicing Agreement ("TSA") § 3.05 (Jan. 20, 2016), https://www.sec.gov/Archives/edgar/data/1174821/000119312516434830/d102477dex45.htm.

## **LEGAL PRINCIPLES**

### I.   **STANDARD OF REVIEW**

To decide a motion to dismiss for failure to state a claim upon which relief may be granted, courts "ask whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Although preemption . . . is an affirmative defense, it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint." *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015).

"The court accepts as true all well-pleaded factual allegations in the complaint [and] draws all reasonable inferences in favor of the nonmoving party." *Id.* (citation omitted). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted). Thus, a court "may find a claim preempted only if the facts alleged in the complaint do not plausibly give rise to a claim that is not preempted." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015). But courts "are not bound to accept as true a legal conclusion couched as a factual allegation," nor will "a formulaic recitation of the elements of a

cause of action" suffice. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

In making this determination, a court "considers, in addition to the complaint, and written instruments attached, statements incorporated by reference, and public disclosure documents." *Gamm*, 944 F.3d at 462 (citation omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers*, 282 F.3d at 153 (citation omitted). Courts "may also consider items of which it has taken judicial notice under Federal Rule of Evidence 201," *Gamm*, 944 F.3d at 462, including "newspaper articles, documents publicly filed with the [Securities and Exchange Commission ("SEC")] or [the Financial Industry Regulatory Authority], documents filed with a Secretary of State, documents filed with governmental entities and available on their official websites, and information publicly announced on certain non-governmental websites, such as a party's official website," *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (collecting cases).

Peterson incorporates by reference the Prospectus, *see* Docket Item 1 at 10 n.5, as well as the RPA, *see id.* at 11 n.6, and the TSA, *see id.* at 12 n.7. This Court also takes judicial notice of the RPA and TSA, which are publicly available on the SEC's website. *See* RPA, https://www.sec.gov/Archives/edgar/data/1174821/000119312516434830/d102477dex44.htm; TSA,

https://www.sec.gov/Archives/edgar/data/1174821/000119312516434830/d102477dex4
5.htm.

## II.   THE NATIONAL BANKING ACT AND PREEMPTION

The National Banking Act ("NBA") authorizes "national banks"—"corporate
entities chartered not by any State, but by the Comptroller of the Currency of the U.S.
Treasury," *Wachovia Bank v. Schmidt,* 546 U.S. 303, 306 (2006)—to exercise several
enumerated powers as well as "all such incidental powers as shall be necessary to
carry on the business of banking."  12 U.S.C. § 24 (Seventh).  Under the Supremacy
Clause, the NBA preempts many state consumer-protection laws because of both
express and implicit Congressional intent.  *See generally Barnett Bank of Marion Cnty.,
N.A. v. Nelson*, 517 U.S. 25, 30-31 (1996).

### A.   Express Preemption

"The Supreme Court has interpreted 'grants of both enumerated and incidental
powers to national banks as grants of authority not normally limited by, but rather
ordinarily preempting, contrary state law.'"  *SPGGC, LLC v. Blumenthal*, 505 F.3d 183,
189 (2d Cir. 2007) (quoting *Barnett Bank*, 517 U.S. at 32).  For example, because the
NBA "expressly permits national banks to 'charge on any loan . . . interest at the rate
allowed by the laws of the State, Territory, or District where the bank is located,'" and
"also 'provide[s] the exclusive cause of action' for usury claims against national banks,"
the Act "completely preempt[s] analogous state-law usury claims" against national
banks.  *Madden v. Midland Funding, LLC*, 786 F.3d 246, 250 (2d Cir. 2015) (alterations
in original) (first excerpt quoting 12 U.S.C. § 85) (second quoting *Beneficial Nat'l Bank v.
Anderson*, 539 U.S. 1, 11 (2003)) (third quoting *Sullivan v. Am. Airlines, Inc.*, 424 F.3d

267, 275 (2d Cir. 2005)).  Stated differently, in light of 12 U.S.C. § 85, "there is 'no such

thing as a state-law claim of usury against a national bank.'"  *Id.* (quoting *Beneficial Nat'l*

*Bank*, 539 U.S. at 11).

### B.    Significant Interference (Conflict Preemption)

"NBA preemption can be extended to non-national bank entities . . . [when]

application of state law to [the non-national bank entity's] action [would] significantly

interfere with a national bank's ability to exercise its power under the NBA."  *Id.* (citing

*Barnett Bank*, 517 U.S. at 33; *Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 353

(2d Cir. 2008)); *see also* 12 U.S.C. § 25b(b)(1)(B)) (the NBA preempts state consumer

financial laws which "prevent[ ] or significantly interfere[ ] with the exercise by [a]

national bank of its powers").  "In most cases in which NBA preemption has been

applied to a non-national bank entity, the entity has exercised the powers of a national

bank—*i.e.*, has acted on behalf of a national bank in carrying out the national bank's

business."  *Id.*  For example, "the Supreme Court has held that operating subsidiaries of

national banks may benefit from NBA preemption," and the Second Circuit has held that

"agents of national banks can benefit from NBA preemption."  *Id.* (citing *Watters v.*

*Wachovia Bank, N.A.*, 550 U.S. 1, 18 (2007); *Pac. Cap. Bank*, 542 F.3d at 353-54)

(additional citations omitted).

And if applying state law might indirectly interfere with a national bank's exercise

of its powers, NBA preemption may apply even to non-national bank entities that are not

agents of a national bank.  *See Barnett Bank*, 517 U.S. at 31 (explaining that courts find

implicit preemption when federal law is "in irreconcilable conflict" with state law, such

that compliance with both statutes "may be a physical impossibility," or "the state law

8

may stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (citations and alterations omitted)).  In deciding whether to apply NBA preemption under such circumstances, courts ask "whether the [state] regulation at issue actually affects the national bank's exercise of any authorized powers or [instead] limits only activities of the third party which are otherwise subject to state control."  *Blumenthal*, 505 F.3d at 191.

In *Blumenthal*, for example, the Second Circuit considered whether certain state laws regulating gift cards issued by a national bank but sold by a non-national-bank entity were preempted by the NBA.  The state's prohibition on gift card expiration dates might be preempted, the court held, because that regulation could interfere with the issuing national bank's power to "offer[ ] 'electronic stored value systems."  *Id.* at 189 (quoting 12 C.F.R. § 7.5002(a)(3)).  More specifically, because the national bank was both "legally entitled" to, and benefitted financially from its decision to, operate the gift cards on the Visa payment network, and because Visa required expiration dates, "an outright prohibition on expiration dates could have prevented [the national bank] from acting as the issuer of the [gift card]."  *Id.* at 191.  But the state's prohibition on inactivity fees was not preempted because those fees were "establish[ed]," "collected[,] and retained" by the non-national-bank entity.  *Id.*  The court was clear that its decision "d[id] not address whether [it] would reach a different conclusion were the fees in question established and collected by the issuing [national] bank rather than by [the non-national-bank entity]."  *Id.* (citation omitted).

More recently, in *Madden*, the Second Circuit considered whether the NBA preempted enforcement of New York's usury laws against two non-national-bank

entities that had purchased credit card debt from two national banks and then serviced

the account going forward.  786 F.3d at 248.   The national banks did not "possess[ ]

any further interest in the account," *id.*, the court found, and so express NBA preemption

did not apply.  In determining whether the state laws were implicitly preempted, the

court first found that the non-national-bank entities, as third-party debt buyers, were

neither agents nor subsidiaries of the national banks but instead "[a]cted solely on their

own behalves, as the owners of the debt."  *Id.* at 2501-51 (citing OCC Bulletin 2014–37,

Risk Management Guidance (Aug. 4, 2014), http://www.occ.gov/news–

issuances/bulletins/ 2014/bulletin–2014–37.htm).  The court then found that preemption

was not otherwise justified by indirect interference with the national banks' activities.

The court explained that enforcing New York's usury laws against the non-national-bank

entities "would not prevent consumer debt sales by national banks to third parties.

Although it [was] possible that usury laws might decrease the amount a national bank

could charge for its consumer debt in certain states (*i.e.*, those with firm usury limits, like

New York), such an effect would not 'significantly interfere' with the exercise of a

national bank power."  *Id.* at 251.

   The *Madden* court distinguished the facts of that case from those presented in

*Krispin v. May Department Stores*, 218 F.3d 919 (8th Cir. 2000).  In that case, the

Eighth Circuit held that a state law limiting delinquency fees could not be enforced

against a non-national-bank entity that had purchased certain credit accounts'

receivables from a national bank because the national bank still "issue[d] credit,

proceesse[d] and service[d] customer accounts, and set[ ] such terms as interest and

late fees."  *Id.* at 923-24.  The Second Circuit explained that in *Krispin,* the "national

bank retained ownership of the accounts," but in *Madden,* neither of the national banks

involved "ha[d] retained an interest in [the] account [at issue]."  *Madden*, 786 F.3d at

252.  The court continued:

> The point of the *Krispin* holding was . . .  that notwithstanding the [national]
> bank's sale of its receivables to [a non-national-bank entity], it retained
> substantial interests in the credit card accounts so that application of state
> law to those accounts would have conflicted with the [national] bank's
> powers authorized by the NBA. . . .  As we understand the *Krispin* opinion,
> the fact that the bank was described as the "originating entity" had no
> significance for the court's decision, which would have come out the
> opposite way if the [national] bank, notwithstanding that it originated the
> credits in question, had sold them outright to a new, unrelated owner,
> divesting itself completely of any continuing interest in them, so that its
> operations would no longer be affected by the application of state law to the
> new owner's further administration of the credits.

*Id.* at 252 n.2.

### C.    OCC Regulations

The Office of the Comptroller of the Currency ("OCC"), "the agency charged with

implementing the NBA and overseeing national banks in the exercise of their powers

thereunder," *see Blumenthal*, 508 F.3d at 188 (citations omitted), recently issued

guidance on when the NBA preempts state usury laws.  Because the OCC "has broad

authority . . . to define the 'incidental powers' of national banks and to authorize

activities beyond those enumerated in the statute," and because federal regulations

"have no less preemptive effect than federal statutes," this regulation provides a source

of national banks' authority and, by extension, federal preemption.  *See id.* (citation

omitted).

In June 2020, the OCC issued a Final Rule entitled "Permissible Interest on

Loans that Are Sold, Assigned, or Otherwise Transferred," 85 Fed. Reg. 33530-01,

2020 WL 2836957 (Jun. 2, 2020) (to be codified at 12 C.F.R. § 7.4001(e)).  That

11

regulation, effective August 3, 2020, provides:  "Interest on a loan that is permissible under 12 U.S.C. [§] 85 shall not be affected by the sale, assignment, or other transfer of the loan."  12 C.F.R. § 7.4001(e).  The OCC explained that the regulation draws on both the express and conflict preemption principles discussed above.

In terms of express preemption, the OCC explained that "[t]he NBA . . . clearly establishes" that a national bank may "(1) lend money, pursuant to a loan contract, with an interest term that is consistent with the laws of the state in which the bank is located," 85. Fed. Reg. at 33531 (citing 12 U.S.C. § 85), and "(2) subsequently transfer that loan and assign the loan contract," *id.* (citing 12 U.S.C. §§ 24(Third), (Seventh); 12 C.F.R. § 7.4008(a); *Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322, 377-78 (1848)) (additional citations omitted).[3]  And because the NBA did "not expressly address how the exercise of a national bank's authority to transfer a loan and assign the loan contract affects the interest term, . . . the OCC [could] interpret section 85 to resolve this silence."  *Id.* (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).[4]  The regulation thus defines an incidental power of national banks and, in

---

[3] *See also* 12 U.S.C. § 24(Third) ("[A national bank] shall have power . . . [t]o make contracts."); 12 U.S.C. § 24(Seventh) ("[A national bank] shall have power . . . [t]o "discount[ ] and negotiat[e] promissory notes . . . and other evidences of debt."); C.F.R. § 7.4008(a) ("A national bank may make, sell, . . . or otherwise deal in loans [not secured by real estate], subject to such terms . . . prescribed by . . . [f]ederal law."); *Planters' Bank*, 47 U.S. at 323 ("[I]n discounting notes and managing its property in legitimate banking business, [a bank]must be able to assign or sell those notes when necessary and proper.")

[4] The Court notes that, although not material to its disposition of this motion, an "'agency's conclusion that . . . state law is pre-empted' receive[s] lesser, *Skidmore* deference.  Such regulations guide the court's inquiry only to the extent of their 'thoroughness, consistency, and persuasiveness.'"  *Hymes v. Bank of Am., N.A.*, 408 F. Supp. 3d 171, 190 (E.D.N.Y. 2019) (quoting *Wyeth v. Levine*, 555 U.S. 555, 576 (2009) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also* 12 U.S.C.A. § 25b(b)(5)(A) (" A court reviewing any determinations made by the Comptroller regarding

doing so, preempts state-law usury claims on any loans sold, assigned, or transferred by a national bank.

In the context of conflict preemption, the OCC explained that the regulation promoted two important goals of the NBA: uniformity and risk management. *Id.* at 3352-33. Section 85, the OCC elaborated, "facilitates national banks' ability to operate lending programs on a nationwide basis, a characteristic fundamental to national banks since their inception, . . . [and r]eading section 85 as applying only to loans that a national bank holds to maturity would undermine this statutory scheme." *Id.* at 3352. And because "national banks of all sizes . . . routinely rely on loan transfers to access alternative funding sources, manage concentrations, improve financial performance ratios, and more efficiently meet customer needs," the regulation "promotes safe and sound operations." *Id.* at 3352-53. In other words, the OCC opined that making transferred loans susceptible to state usury laws would "prevent[ ] or significantly interfere[ ] with the exercise by . . . national bank[s] of [their] powers," *see* 12 U.S.C. § 25(b)(1)(B).

## **DISCUSSION**

### I.   **NBA PREEMPTION**

Peterson's state-law usury claims are expressly preempted by the NBA. Even before the OCC issued its rule clarifying that interest permissible before a transfer

---

preemption of a State law by [12 U.S.C. § 85] shall assess the validity of such determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision.").

remains permissible after the transfer, Peterson's claims would have been preempted. That is so because JPMCB, which Peterson agrees is a national bank, *see* Docket Item 60 at 13, continues to possess an "interest in the account," *see Madden*, 786 F.3d at 248.

Unlike in *Madden*—where the national banks had entirely "discharged," and no longer "possessed any further interest in," the loan account—here JPMCB retains a number of rights.  For example, JPMCB "retain[s] the right to change various terms and conditions," including "*increasing or decreasing periodic interest charges*."  Prospectus at 26, 46 (emphasis added).  And in the event of default, "all the right, title and interest . . . in and to the [r]eceivables in such [d]efaulted [a]ccount" are "automatically" sold back to JPMCB.  *See* RPA § 3.05; TSA § 3.05.

JPMCB is therefore akin to the national bank in *Krispin*, which the Second Circuit distinguished because it had not "sold [the accounts at issue] outright to a new, unrelated owner, divesting itself completely of any continuing interest in them," but instead "retained substantial interests in the credit card accounts."  *Madden*, 786 F.3d at 252 n.2; *see also Scott*, 580 F. App'x at 57 ("[S]ecuritizing credit card receivables . . . does not divest the issuer of its ownership interest in the credit card accounts." (collecting cases)); Fed. Deposit Ins. Corp., Credit Card Securitization Manual 10-11 (2007) ("FDIC Manual"), https://www.fdic.gov/regulations/examinations/credit_card_securitization/pdf_version/index.html ("The financial institution retains legal ownership of the credit card accounts and can continue to change the terms on the accounts.").  In other words, because a national bank (JPMCB) sets the interest rate on Peterson's account, it may do so at the

"interest . . . rate allowed by the laws of the State, Territory, or District where the bank is located," 12 U.S.C. § 85, and is not subject to the usury laws of other states.

To the extent there is any doubt as to whether JPMCB, like the national bank in *Krispin*, in fact retains a "substantial interest" in Peterson's account, resolving that doubt in Peterson's favor would not change the outcome.  In *Krispin*, the national bank "issue[d] credit, processe[d] and service[d] customer account, and set[ ] such terms as interest and late fees."  218 F.3d at 923-23.  Peterson observes that JPMCB does not service the accounts to reap the debts for itself but instead as a paid agent of the Trust. *See* Docket Item 42 at 17.  But that is of no moment:  as the OCC's regulation makes clear, even if state usury law is not expressly preempted by the NBA, it at least is implicitly preempted—that is, even if JPMCB does not retain a substantial interest in the account, enforcing state usury laws against Chase still would "significantly interfere" with JPMCB's exercise of its NBA powers.  As the OCC explained, leaving transferred loans susceptible to state usury laws would undermine the NBA's goals of uniformity and risk management.  *See* 85 Fed. Reg. at 3352-53.[5]

---

[5] The Federal Deposit Insurance Corporation agrees:

> Securitizations, when used properly, provide financial institutions with a useful funding, capital, and risk management tool. By using securitizations, a credit card issuer may be able to obtain lower cost funding, diversify its funding sources, improve financial indices, potentially lower regulatory costs, and increase its ability to manage interest rate risk. In addition, securitizations may allow banks to reduce asset-class concentrations in the overall portfolio, create underwriting and pricing discipline (provide market feedback regarding asset value), and leverage origination skills and systems capacity by increasing the volume of transactions that pass through the bank. In addition, servicing is often retained by the originator which minimizes customer disruption and enhances fee income.

FDIC Manual at 5.

Although the Second Circuit reached a different conclusion in *Madden,* it did so on materially different facts—a loan that had been sold "outright," not one that remained in at least some legal sense with the national bank.  Stated differently, even if JPMCB does not retain a "substantial interest" in Peterson's loan, it retains, at the very least, more than "[no] further interest."[6]  And in the context of that middle ground, the Court defers to the OCC's reasoned judgment that enforcing New York's usury laws against the Chase defendants would significantly interfere with JPMCB's exercise of its NBA powers.[7]  The Court is not alone in finding that the retention of rights following default is material to the ownership analysis.  *See , e.g.*, *Willard v. Bank of Am.*, 204 F. Supp. 3d 829, 834 (E.D. Pa. 2016) (finding that a national bank "maintain[ed] ownership of [certain] credit card accounts" that it had securitized because, following default, the

---

[6] Peterson appears to recognize, and attempts to elide, the critical distinction between owning *only* receivables (as here) and owning the accounts outright (as in *Madden*), frequently interchanging the terms "debt" and "receivables" and never addressing the fact that defaulted accounts automatically return to JPMCB.  *See, e.g.*, Docket Item 42 at 20-21 ("As described repeatedly in the [c]omplaint, [JPMCB] has sold, transferred, and conveyed to [the d]efendants all right title and interest in [Peterson's] credit card receivables. . . .  Thus, whatever account ownership means, [JPMCB's] retention of account ownership does not mean that [JPMCB], as the originating entity, retains an interest in the debts it has sold to third parties." (citations omitted)).

[7] Peterson argues that the OCC's regulation is not entitled to deference because it "does not actually contain any analysis or findings about any specific state statutes or the actual effects of application of these statutes to regulations of banks under the National Bank Act," but instead is "a poorly reasoned legal brief, drafted for the explicit purpose of overruling *Madden.*"  *See* Docket Item 55 at 9; *see also Hymes*, 408 F. Supp. 3d at 192 ("Analysis of case law, as a general rule, falls squarely within the expertise the federal courts, not agencies." (citing *New York v. Shalala*, 119 F.3d 175, 180 (2d Cir. 1997)).  That may be true of the OCC's analysis of express preemption, but it is not true of the OCC's fact-specific analysis of implicit preemption, which is "thorough[ ], consisten[t], and persuasive[ ]," *see id.* at 190 (citations omitted).  And, as stated above, the Court does not rely on the regulation in finding Peterson's claims expressly preempted—that finding is premised on the Second Circuit's reasoning in *Madden.*

"receivables [were] immediately ejected from the trust and sold back to" the national bank, meaning that the national bank retained "the right to collect" on the accounts).

In short, Peterson's state-law usury claims are expressly preempted by the NBA because JPMCB retains a substantial interest in his account and, accordingly, may set "interest at the rate allowed by the laws of the State, Territory, or District where the bank is located," 12 U.S.C. § 85.  And even if they were not, they would be implicitly preempted for the reasons provided by the OCC.

## II.   WHETHER JPMCB "IS LOCATED" IN DELAWARE OR NEW YORK

Peterson also argues that Judge McCarthy erred in failing to establish where JPMCB "is located" for purposes of section 85.  *See* Docket Item 60 at 13-14.  That argument is a non-starter, as Peterson did not advance this argument before Judge McCarthy.

Peterson stated in his papers opposing dismissal that he "d[id] not believe his complaint implicate[d] [JMPCB's] ability to charge interest rates irrespective of state law."  Docket Item 42 at 15 n.8.  Although Peterson also stated that he "d[id] not concede that [JPMCB] [was] entitled to charge interest according to Delaware law under [section] 85" because an SEC form cited by the defendants stated that JPMCB "[was] located in New York, New York," *id.*, Peterson did not expand on this argument in any of his papers before Judge McCarthy.  Peterson therefore waived any argument that JPMCB is located in New York.  *See Deats v. Monroe Cty.*, 2014 WL 6769756, at *4 (W.D.N.Y. Dec. 1, 2014) ("The lack of any form of a developed argument on this point would justify a determination by this Court to not address this claim, and deem it

waived." (citing *State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004)).

In any event, Peterson's argument is unavailing. The straightforward corollary of this Court's determination that JPMCB may "charge on [Peterson's] loan . . . interest at the rate allowed by the laws of the State, Territory, or District where [JPMCB] is located," 12 U.S.C. § 85, is that the NBA "provide[s] the exclusive cause of action' for usury claims" concerning that loan, *see Madden*, 786 F.3d at 250 (quoting *Beneficial Nat'l Bank*, 539 U.S. at 11). In other words, with respect to Peterson's loan, sections 85 and 86 of the NBA "supersede both the substantive and the remedial provisions of [New York's] usury laws and create a federal remedy for overcharges that is exclusive." *Beneficial Nat'l Bank*, 539 U.S. at 11. But Peterson has neither named JPMCB as a defendant nor brought suit under the NBA. He also has not moved to amend his complaint, instead asserting only that his claims, as pleaded, should not be dismissed. Thus, even if this Court were to consider the merits of Peterson's waived argument, it still would fail because he has not asserted a viable claim.

## III.   NEW YORK UNJUST ENRICHMENT CLAIM

Judge McCarthy recommended dismissal of Peterson's second cause of action for unjust enrichment, *see* Docket Item 57 at 8, explaining that because Peterson's "unjust enrichment claim relies on identical facts as [his usury] claim[,] . . . it too is preempted." *Id.* (first alteration in original) (quoting *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 (11th Cir. 2011)). Peterson objected to this recommendation on the same grounds discussed above in the context of his usury claim. Because that

18

claim is dismissed, and because Peterson did not otherwise object to Judge McCarthy's recommendation, Peterson's claim for unjust enrichment also is dismissed.

## **CONCLUSION**

For the reasons stated above and in the R&R, the defendants' motion to dismiss, Docket Item 21, is GRANTED; the complaint, Docket Item 1, is dismissed; and the Clerk of the Court shall close the file.


SO ORDERED.


Dated:        September 21, 2020
              Buffalo, New York


                                        */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE